DECEMBER 14, 1910.

Attachment. Before Judge Charlton. Chatham superior court. August 29, 1909.

*W. R. Leaken*, for plaintiff in error. *A. L. Alexander*, contra.

---

CENTRAL OF GEORGIA RAILWAY COMPANY *v.*
CENTRAL TRUST COMPANY OF NEW YORK, *et vice versa.*

CENTRAL OF GEORGIA RAILWAY COMPANY *v.*
MANHATTAN TRUST COMPANY OF NEW YORK,
*et vice versa.*

1. A railway corporation chartered in pursuance of a plan of reorganization to take over the properties of another corporation being administered through a receivership, and to provide for its liabilities, issued three series of income bonds, identical in form and in terms, but of successive priorities. The bonds were issued in denominations of $1,000 each, and contained an obligation to unconditionally pay, at the end of fifty years, the principal sum "with interest thereon from November 1st, 1895, at a rate not exceeding five per cent. in any one fiscal year, . . on October 1st of each year when declared to be earned and due. Such interest is non-cumulative, and shall be payable only out of the net earnings and income of the said railway company, applicable for such purpose, when and as the same shall be ascertained and fixed for each fiscal year in the manner and upon the conditions provided in the mortgage securing these presents." The mortgage recited that it was executed "to secure equally the payment of the principal and interest of all such bonds," and covered the railroad, estates, rights, etc., of the

mortgagor, as described, and subject to designated prior incumbrances. The mortgage provided that the fund available for interest was to be ascertained in this way: "Beginning with the fiscal year ending June 30, 1896, the board of directors of the railway company shall ascertain and declare the net earnings and income applicable to the payment of interest upon the bonds secured hereby, for the fiscal year ending the 30th day of June in each year, by deducting from the gross earnings and income of the railway company system for such fiscal year all sums paid or reserved for interest on all mortgage bonds specified herein having lien prior or superior thereto, or bonds issued in renewal thereof or in exchange therefor, on all equipment notes, and any bonds resting upon new roads or property hereafter by it acquired, leased, or controlled, and for any and all expenses and losses of operating its system, and for maintenance, taxes, assessments, insurance, rentals upon all leased lines, including those specified herein, and other like charges, cost of repairs, renewals, and reasonable betterments to the railroad equipment and property used by the railway company and proper for its economical and efficient operation, and for all deficiencies resulting from payments for any such purpose in former years, and all advances which shall have been made to provide for such deficiencies, or any part of them, and shall apply such net earnings and income (or such portion thereof as may be necessary) toward payment of the interest on the bonds hereby secured, in accordance with their terms and the provisions hereof. The party of the first part shall not declare or pay, nor shall the bondholders be entitled to receive, interest on such bonds to exceed five per cent. in any one fiscal year, and such interest shall be strictly non-cumulative and be declared and payable only out of the net earnings available for that purpose, ascertained and determined as herein provided. The said net earnings and income of each fiscal year shall be ascertained and declared by the directors not later than the 1st day of September following each 30th day of June, and the interest declared by them shall be paid on the first day of October following." It was further stipulated that the railway company, on or before September 1st of each year, shall furnish the trustees with a statement showing the amount of the net earnings and income of the previous fiscal year, so ascertained and declared to be applicable to the interest; and that the trustees, on complaint within thirty days of one third of the bondholders as to the amount declared, shall have the right to inspect the company's books. If the trustee should differ with the railway company's statement, and that difference be not adjusted, then, at the request of one third of the bondholders, it shall be the duty of the trustee to file a bill in equity for an account of the net earnings and income under the provisions of the mortgage; and if it be adjudged that there are such net earnings and income available, beyond the amount declared by the railway company in its statement, then the failure of the railway company to apply such funds to interest not to exceed five per cent. within three months of the adjudication shall constitute a default. The remedy provided for ascertaining the amount of net earnings was declared to be exclusive of all other proceedings whatsoever. An action was brought by the trustee against the railway company, pursuant to the terms of the mortgage. *Held:*

(*a*) That in the ascertainment of the fund available to pay the interest on the bonds the railway company can not deduct from its gross earnings and income any items of expense, charges, or reservations not embraced in the enumeration of deductions specified in the mortgage.

(*b*) The betterments permissible as an item of deduction relate to the betterment of the equipment of the railway company, and do not include the purchase or lease of other railroads or lands acquired for expansion or extension of the railroad.

(*c*) Betterments to railroad equipment authorized by the mortgage are such as better or benefit the railroad equipment and other property used in the operation of the railroad company, reasonable in character and proper for the economical and efficient operation of the railroad company; such betterments are not limited to renewals or replacements of equipment, but may include additions thereto; provided such enlargement of equipment is reasonable and proper in the economical operation of the railroad company to keep its equipment in a state of efficiency to enable the railroad company to discharge its duties to the public.

(*d*) Dividends derivable from the railroad's ownership of stock in another corporation are part of its income, and enter into the computation of the fund applicable to interest on the income bonds.

2. One corporation may be the sole stockholder of another corporation, but the stockholding corporation has no right to demand the profits of the corporation of which it is the sole stockholder until such profits are declared and set aside by the corporation which earned them. The formal way of transferring profits to the stockholder is by the declaration of a dividend; but if the corporation turns over its profits to the stockholder without this formality, the transaction is good, and may not be attacked where the act does not impair the rights of third parties. Under the special facts of this case the auditor was authorized to find that the Ocean Steamship Company had turned over its profits to the railway company for the fiscal year ending June 30, 1907, and that the railway company had accepted such profits and used the same as its own funds, and that such profits so received were part of the railroad's income for that year.

3. The 11th paragraph of the mortgage provides that "The trustees shall be entitled to reasonable compensation for all services they may render in the execution of the trusts of this mortgage, to be paid by the railway company." The railway company, in the mortgage, imposed the duty on the trustee of filing this proceeding for the ascertainment of the fund available for interest. In the performance of this duty the trustees, in the event they prevailed in the suit, are entitled to necessary expenses connected with the prosecution of the action, including counsel fees. The allowance for this purpose was not excessive in amount.

4. Inasmuch as the interest coupons called for interest at a rate not exceeding five per cent. when declared to be earned and due as provided in the mortgage, such coupons do not draw interest until there is a default in payment according to the terms of the mortgage.

5. Where parties to a cause which is referred to an auditor stipulate that the court may allow reasonable fees to the auditor in excess of the amount fixed by Civil Code, § 4602, and this stipulation is approved by the court, the fees of the auditor may be in excess of the statutory

amount. In this case the fees allowed to the auditor were not unreasonable or excessive.

6. In the allowance of auditors' fees the court may in its discretion apportion the same between the parties. There was no abuse of discretion in this case in dividing the auditor's fee between the litigants.

DECEMBER 14, 1910.

Equitable petition. Before Judge Charlton. Chatham superior court. August 26, 1909.

The Central Railroad and Banking Company of Georgia, a domestic corporation, owned, controlled, and operated a system of railroad, and was also the sole stockholder in the Ocean Steamship Company. The railroad company passed into the hands of a receiver, and, pending the receivership, interested parties conceived a plan of reorganization. By this plan a new organization, the Central of Georgia Railway Company, was to be incorporated and was to acquire the properties of the old corporation and take care of its liabilities by the substitution of new securities. The plan was consummated during the year 1895. Among the properties acquired was the stock of the Ocean Steamship Company, which was taken subject to a debt of the old corporation, to secure which it had been pledged. Among the securities issued by the new corporation, pursuant to the reorganization plan, were three series of income bonds, identical in form and in terms, but of successive priorities, viz.: 1st income bonds $4,000,000, second income $7,-000,000, and third income $4,000,000; a total of $15,000,000. The bonds were issued in denominations of $1,000, and the principal of the bonds was payable without condition at the end of fifty years. Each series of bonds was secured by a mortgage, identical in form and in terms, wherein it was stipulated: "Beginning with the fiscal year ending June 30, 1896, the board of directors of the railway company shall ascertain and declare the net earnings and income applicable to the payment of interest upon the bonds secured hereby, for the fiscal year ending the 30th day of June in each year, by deducting from the gross earnings and income of the railway company system for such fiscal year all sums paid or reserved for interest on all mortgage bonds specified herein having lien prior or superior thereto, or bonds issued in renewal thereof or in exchange therefor, on all equipment notes, and any bonds resting upon new roads or property hereafter by it acquired, leased, or controlled, and for any and all expenses and losses of operating

.its system, and for maintenance, taxes, assessments, insurance, rentals upon all leased lines, including those specified herein, and other like charges, cost of repairs, renewals, and reasonable betterments to the railroad equipment and property used by the railway company and proper for its economical and efficient operation, and for all deficiencies resulting from payments for any such purpose in former years, and all advances which shall have been made to provide for such deficiencies, or any part of them, and shall apply such net earnings and income (or such portion thereof as may be necessary) toward payment of the interest on the bonds hereby secured, in accordance with their terms and the provisions hereof. The party of the first part shall not declare or pay, nor shall the bondholders be entitled to receive, interest on such bonds to exceed five per cent. in any one fiscal year, and such interest shall be strictly non-cumulative and be declared and payable only out of the net earnings available for that purpose, ascertained and determined as herein provided. The said net earnings and income of each fiscal year shall be ascertained and declared by the directors not later than the 1st day of September following each 30th day of June, and the interest declared by them shall be paid on the first day of October following, and such payment stamped on such bonds, except in the case of registered holders, who shall be entitled to receive their interest when declared and payable without production of their bonds. The railway company shall, on or before the first day of September of each year, furnish the trustees with a statement showing the amount of the net earnings and income of the previous fiscal year, so ascertained and declared to be applicable to the interest on the bonds secured by this mortgage, and forthwith give public notice, by advertisement in some newspaper published in each of the cities of New York and Savannah, of the rate of interest determined to be payable on said bonds, and when and where the same will be paid; and in default of the notification of the trustee by the requisite number of bondholders, as hereinafter provided, such ascertainment declaration by the board of directors of the railway company shall be final and conclusive between the parties hereto and upon all holders of bonds secured hereby. If the trustee shall be notified in writing by the holders of bonds, to the amount of one third of the amount then outstanding, that they object to the same within thirty days after the same shall have been received by

the trustee, it shall be the duty of the said trustee forthwith to notify the railway company of such objection. And the trustee shall have the right to inspect the books of the railway company by a proper officer of said trustee, or by an expert accountant appointed for the purpose by said trustee, who shall be paid for his services by the railway company. If the said difference for any reason shall not be adjusted by agreement between the trustee and the railway company, and if the trustee be called upon to proceed by the holders of one third of the amount of bonds outstanding, secured by this mortgage, who shall also have duly indemnified the trustee against all liability for costs and expenses, then in that event it shall be lawful for and the duty of the trustee to file a bill in equity against the railway company in any court of competent jurisdiction for an account of the net earnings and income under the provisions of this mortgage; and if it shall be adjudged in such action that there are such net earnings and income available, under the terms of this mortgage, for the purpose of paying the interest on the bonds secured by this mortgage, beyond the amount declared in the statement so furnished by the railway company, then, unless the railway company shall, within three months after such adjudication, pay the said balance of the net earnings and income so adjudged to be available by way of interest to the holders of bonds hereby secured, not exceeding the maximum percentage allowed in any one fiscal year, such non-payment shall constitute a default in the payment of interest, for which the trustee shall be authorized to proceed to enforce this mortgage. The remedy herein provided for ascertaining the amount of the net earnings, in case of dispute, shall be exclusive of all other proceedings, actions, suits, and demands whatsoever." (Par. 8 of the mortgage.)

The railway company furnished the trustee of each series with a statement showing the amount of the net earnings and income of the railway company for the fiscal year 1907, in which it was declared that the net earnings and income applicable to the payment of interest on the three series of income bonds were of a sum sufficient to pay five per cent. interest on the 1st series, 3.729 per cent. on the second series, and nothing on the third series. The trustees of the second and third series, upon inspection of the railway company's books, differed with the board of directors of the railway company as to the amount of net earnings and income applicable

to the interest on the bonds, and, not being able to adjust their differences, filed their actions against the railway company and the Ocean Steamship Company, and the directors of each, for an account of the net earnings and income of the railway company, as provided in the mortgage. The defendants answered, and the cases were consolidated and referred to an auditor. The auditor reported substantially in favor of the contentions of the trustees as alleged in their petitions, and exceptions of law and fact were filed thereto by the defendants. The court sustained two exceptions and overruled the others; whereupon the defendants sued out writs of error complaining of the judgment of the court overruling their exceptions, and the plaintiffs by cross-bill of exceptions complain of the judgment of the court as to the exceptions which were sustained.

*Lawton & Cunningham* and *J. R. Lamar,* for plaintiffs in error.

*Joline, Larkin & Rathbone, Adams & Adams, William N. Cohen,* and *Alfred A. Cook,* contra.

EVANS, P. J. (After stating the foregoing facts.)

In its last analysis this is an action to recover interest which the second and third preference income bondholders, through their respective trustees, claim was applicable to such purpose from the income of the railway company for the fiscal year 1907, according to the contract between the railway company and the trustees, as contained in the bonds and the mortgages given to secure their payment. As the bonds and mortgages of the two series of income bonds are identical in form and terms, and differ only in giving preference in payment to the second over the third, we will discuss the questions raised as if there were but one case. Indeed, the two cases were consolidated and tried as one case in the trial court. The bond and mortgage constitute the contract between the complaining bondholders and the railway company, and the rights of the former and the obligations of the latter are controlled solely by a construction of the contract in its application to the issues made by the pleadings.

It is elementary law that in the interpretation of written contracts courts should diligently examine the whole instrument to ascertain the intention of the parties, and, if the contract is not ambiguous, that intention must be found within the four corners of the instrument. The mortgage begins with a recital that the mortgaging railway company is possessed of all the charter powers

of the old Central Railroad and Banking Company of Georgia (which corporation formerly owned substantially all of the property mortgaged), and that by virtue of its charter it possessed full power to purchase, lease, and operate other lines of railroad and also to own and run steamboats and vessels to facilitate the business operations of the mortgagor; and that in pursuance of such powers the mortgagor, besides owning the main and branch line of the old corporation, had contracted for and purchased additional lines described in the mortgage. It was further recited that it was necessary for the mortgagor to borrow a large sum of money "which is and will be required to purchase and pay for the title to such main line of railroad and branch, and to pay for other railroads, leaseholds, steamship stocks, bonds, and other properties hereinbefore specified," and to execute and issue bonds for the loans, and to secure their payment "by mortgages upon its railroads, stocks, bonds, property, and franchises, and the income thereof." It was further recited that the board of directors, with the unanimous approval of the stockholders, were empowered in the name of the mortgagor to execute a mortgage on all railroads, equipment, stock, etc., to secure the payment of income bonds for a stated sum, "with interest thereon at the rate of not exceeding five per cent. in any one fiscal year, . . only out of the net income and earnings of such railroad and other properties, available for such purpose . . on the first day of October in each year and when declared on such terms as are provided in the mortgage securing such bonds." A form of the bonds was incorporated in the mortgage, which contained an obligation to pay the principal of the bond, "with interest thereon from November 1st, 1895, at a rate not exceeding five per cent. in any one fiscal year, . . on October 1st of each year, when declared to be earned and due. Such interest is non-cumulative and shall be payable only out of the net earnings and income of the said Railway Company applicable for such purpose, when and as the same shall be ascertained and fixed for each preceding fiscal year in the manner and upon the conditions provided in the mortgage securing these presents." The mortgage recited that it was executed "to secure equally the payment of the principal and interest of all such bonds at any time outstanding and lawfully issued," and covered all the railroad, estates, rights, etc., as described therein (subject to a first mortgage of $7,000,000 upon the main

line, a first mortgage of $1,000,000 on the Mobile division, a first mortgage of $840,000 upon the Macon and Northern division, a consolidated mortgage of $18,500,000 and first income-preference mortgage of $4,000,000) ; also all future acquired lines of railroad and all "franchises, properties real or personal, which the railway company may or shall hereafter possess, or become entitled to possess, for the purpose of or in connection with said lines of railway or any branch or leased or separate line," and also certain stocks including 19,950 shares of the capital stock of the Ocean Steamship Company (which stock was in possession of the Central Trust Company and held by it under the terms of a prior mortgage executed by the Central Railroad and Banking Company of Georgia to secure outstanding bonds), and 2,800 shares of preferred stock and ten shares of common stock of the Wrightsville and Tennille Railroad Company. The mortgage contained many other provisions, including those set out in the statement of facts and noted as paragraph 8 in the mortgage. This paragraph contains a carefully prepared enumeration of items to be employed in the computation of net earnings and income applicable to the payment of interest on the income bonds.

One of the main points of difference between the litigants is the extent of the limitation on the directors' discretion in managing the corporation, imposed by the words, "cost of repairs, renewals, and reasonable betterments to the railroad equipment and property for its economical and efficient operation." The trustees for the income bondholders insist that these words debar the directors of the railway company from using its income and earnings in making payment for additions or permanent betterments, to the prejudice of the income bondholders. The railway company contends, that the mortgage is not a contract to pay interest, but is a contract to pay the principal of the bonds absolutely, and from time to time to use, for the payment of interest (not to exceed five per cent.), available funds the maximum of which shall be measured by the net income of the railway company as defined in the mortgage; that the various provisions of the mortgage amount to no more than an agreement to pay dividends if earned, and the directors' discretion in using the earnings of the company was not intended to be so curtailed that the physical properties could not be expanded and developed so as to meet the requirements of the growth of the country,

the increase of business, the competition of new roads; and that it was not intended that the corporation should be fettered in the preservation of its financial independence and in the discharge of its obligations to the public.

Every contract possesses its own individuality, which must be observed in its interpretation. When these income bonds were issued, it is manifest that the obligor and obligee regarded it to their mutual advantage to enter into this form of contract. The obligor promised to pay not only the principal sum, but also interest thereon at a rate not exceeding five per cent. in any one fiscal year, when declared to be earned and due according to a carefully prepared plan for the ascertainment of a fund out of which it was payable. The mortgage unequivocally declares that it was executed "to secure equally the payment of the principal and interest of all such bonds." The issuance of the income bonds was something more than a pledge of the good faith of the corporation that interest was to be paid if earned; it amounted to something more than an agreement to pay dividends if dividends were earned. It was a solemn convention that the directors of the corporation were to cast the accounts according to the exhaustive plan for the ascertainment of the fund out of which interest was payable, with the privilege of the bondholders to appeal to the courts should they differ with the directors in the computation. To contend otherwise is to denounce as senseless and inane the elaborate effort of skilled financiers to express their contract involving millions of dollars. When the corporation contracted that there should be only such deductions from gross earnings and income as were enumerated, it placed a limitation on the discretion of the directors. There is little, if any, dispute as to the meaning of any of the items of deduction, except as to what charges may properly be embraced in the deduction of "cost of repairs, renewals, and reasonable betterments to the railroad equipment and property used by the railroad company and proper for its economical and efficient operation." This phrase is not of doubtful meaning. It reflects an appreciation of the directors as to their duty to the public in the operation of a quasi public institution, and a performance of that duty with due regard to the railroad company's creditors, whose contract of indebtedness is integrated in the income bond and mortgage. A railroad company owes a duty to serve the public efficiently, but it owes no duty

to the public to expand and enlarge its properties into a great rail-road system so as to incur new and additional burdens and obligations. The plain import of this clause is that a diversion of income to the enlargement of physical properties beyond its duty to give efficient service to the public shall not be permitted to the destruction of the fund from which interest is payable. Relatively to stockholders, directors have a broad discretion in the application of income to the improvement of the corporate property, instead of apportioning some of it to dividends. But an income bondholder, whose interest is only payable from the net income of the year in which the interest accrues, occupies a more favored position than that of a stockholder. A diversion of net income to betterments and expansion of the physical properties to the withholding of an annual dividend does not mean a loss of it to the stockholder, as the stockholder indirectly gets the dividend in the presently enhanced value of his stock. The bondholder whose right to interest is immediate, which interest is forever lost if not paid from the income of the year in which the interest accrues, derives no present benefit from the diversion of income to betterments, but sustains a loss, so far as interest is concerned, which can never be recouped. Even if the payment of the principal of his debt is better assured by successive diversions of income, the interest, if not paid, is forever lost. And then, too, a bond payable fifty years hence has practically no commercial value unless there is some assurance of interest pending its maturity. All this specification of detail could have no other significance than that it was intended to be a definitive check on the discretion of the directors in the management of the company's affairs. The disposition of the net income is not to be governed by the broad discretion of the directors, but by the terms of the bonds and the mortgage securing their payment. 3 Cook on Corporations, § 773; Mackintosh *v.* F. & R. M. R. Co., 34 Fed. 582; Spies *v.* Chicago &c. R. Co., 40 Fed. 38 (6 L. R. A. 565).

The term "betterment" is very elastic. Courts, lexicographers, and financiers recognize it as such, and this record abounds with illustrations and definitions showing the expansive scope which has been given to the word. If there were no income bonds standing in the way, and only stockholders were concerned, betterments might be extended to embrace not only a multitude of improvements but also additions to and enlargement of the physical properties of the

corporation. The 8th paragraph of the mortgage, however, narrows the meaning of betterments. The betterments which are authorized are such as better or benefit the railroad equipment and other property used in the operation of the railroad company. They must be reasonable. They must be proper for the economical and efficient operation of the railroad company. This last expression is the open sesame which reveals the meaning to be given the word "betterments" as used in the mortgage. The railroad company must be kept in a state of efficiency with regard to its public duties, but the expenditures for equipment must not be so lavish in extent and character as to destroy the income bondholder's chance for interest. The equipment is to be bettered in an economical way; the limitation, on the one hand, being the rights of the public, and, on the other, the rights of creditors.

But we do not think that the betterment of the equipment and the property used by the railroad company is necessarily limited to repairs and renewals. A renewal is but a replacement; and if nothing more was intended than a substitution or a reproduction of the old equipment, it would have been idle to specify reasonable betterments as an item of deduction. To illustrate: This company is the successor of another corporation, which had operated this railroad system for more than half a century. The present corporation began business with an old equipment. Suppose, in the matter of the improvement of the Savannah shop, a modern trip-hammer was supplied to take the place of the old, effete method employed before the trip-hammer came into use. Shall it be said that the company must be chained down to old, obsolete, and inefficient machinery in its repair-shop, and forbidden to use its income in economically providing itself with modern appliances? We think not. Again, we do not think it was intended that the locomotive or car of twenty years ago, which has become worthless from use, must be duplicated, but rather that the new equipment should be adapted to the "economical and efficient operation of the railroad company." If the business of the company demanded an increase of equipment, such equipment as is proper to economically operate the railroad compatibly with efficient public service would be a reasonable betterment, notwithstanding in a technical sense it might also be an addition.

In the operation of a railroad company the purchase of new

equipment can not be postponed until that which it is intended to supplant has become absolutely unfit for use. Efficient service can not be rendered in this manner. Locomotives and cars are not sold like merchandise from the shelf. They are ordered in advance of the time they will be needed; and it may be that at the time the order is placed, or at the time the equipment is delivered, the railway company may not have sufficient money on hand with which to pay for them. Still the company is under a duty to immediately render efficient service to the public; and if new equipment is necessary for this purpose, and can be purchased with equipment notes, there is nothing in the 8th paragraph which forbids such a transaction. The provision for the payment of interest on equipment notes from earnings does not exclude the payment of the principal. It would rather seem that this provision was inserted to avoid any complication as to the payment of interest on purchases for equipment proper for the economical and efficient operation of the railroad company, and authorized, under paragraph 8, to be charged against gross earnings and income.

We do not think that the cases of Day v. Ogdensburg &c. R. Co., 107 N. Y. 129 (13 N. E. 765), Thomas v. N. Y. &c. Ry. Co., 139 N. Y. 163 (34 N. E. 877), and Union Pacific R. Co. v. U. S., 99 U. S. 420 (25 L. Ed. 274), are opposed to the proposition that any limitations upon the general powers of directors, intended to define the boundaries of their discretion, should be given due effect. In the Day case the interest, even when ascertained, was not secured by the mortgage; it was payable from "the net earnings of the railroad and other property of the company for each period, after satisfying the expenses of operating and maintaining the same, with all taxes, assessments, and floating indebtedness and the interest on all liens, charges, incumbrances, and other indebtedness." The court held that the income bondholders, so far as their claim to interest was concerned, were simple contract creditors having a debt against the corporation, but no lien by mortgage, and with no other right than to have it paid out of the net earnings as determined by the board of directors at the expiration of each interest period; and that no limitation was placed on the directors' discretion in determining what expenditures were properly chargeable against income; and that the contract was but an agreement to pay dividends if dividends were earned. The contract in the case at bar is vitally differ-

ent from the contract of the income bondholders in the Day case. Here the mortgage was given to secure interest equally with the principal; only such expenditures as were enumerated were allowable; the contract to pay interest is more than an agreement to pay dividends if dividends are earned; and there is a clearly defined limitation that only betterments of a particular nature shall be chargeable against gross earnings and income, with a contractual right of appeal to the courts in case of differences between the corporation and the trustee of the bondholders in the concrete application of this limitation. These features are conspicuously absent in the contract in the Day case. The contract in the Thomas case was similar to that in the Day case, and the decision was controlled by it. In the Union Pacific case, Congress had passed an act in aid of the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, so as to secure to the government the use of the same for postal, military, and other purposes. The act provided for the issue of bonds to the Union Pacific Railway Company and other railroad companies, from time to time, as successive sections of their roads should be completed, and required the companies to perform all government transportation of mail, troops, etc., and to credit the compensation therefor upon the government loan. The bonds were issued conformably to the terms of the act, which provided that "after such road is completed, until said bonds and interest are paid, at least five per cent. of the net earnings of said road shall also be annually applied to the payment thereof." In computing the net earnings the railroad charged to operating expenses certain improvements; and one of the questions was as to the propriety of taking the value of such improvements from the gross earnings in arriving at the net earnings. After formulating and discussing the general rule for the ascertainment of net earnings, the court was of the opinion that the special facts of that case placed the government as a bondholder on the same plane as a stockholder, and said, on page 421: "We think that the true interest of the government in this case is the same as that of a stockholder, and will be subserved by encouraging a liberal application of the earnings to the improvement of the works. It is better for the ultimate security of the government in reference to the payment of its loan, as well as for the service which it may require in the transportation of its property and mails, that a hundred dollars

should be spent in improving the works, than that it should receive five dollars towards the payment of its subsidy. If the five per cent. of net earnings demandable from the company amounted to a new indebtedness, not due before, like a rent accruing upon a lease, a more rigid rule might be insisted upon; but it is not so; the amount of the indebtedness is fixed and unchangeable. The amount of the five per cent., and the receipt at one time or another, is simply a question of earlier or later payment of a debt already fixed in amount. If the employment of any earnings of the road in making improvements lessens the amount of net earnings, the government loses nothing thereby. The only result is that a less amount is presently paid on its debt, whilst the general security for the whole debt is largely increased." The rationale of the principle upon which the case was decided is manifest. The reasoning clearly differentiates it from the case of a bondholder whose right to interest is immediate, where the interest is forever lost if not paid from the net earnings of the year in which it accrues, and whose bond contains no covenants creating obligations relating to duties wholly apart from those ordinarily appertaining to debtor and creditor, nor any covenant implying a prime necessity to the bondholder that the railroad company should be in physical condition to comply with such covenants. In the case just cited the government was perhaps more interested in building up the physical properties of the railway company, so as to afford prompt transportation of mail and troops, than it was in the collection of its debt. The government was both benefactor of the road and a creditor, and "the interest of the government in the improvement of the road was even greater than that of a stockholder." Ill. Cen. etc. R. *v.* Inter. C. C., 206 U. S. 463 (27 Sup. Ct. 700, 51 L. Ed. 1128). We do not think that the principle of these cases militates against our conclusion that under the contract in the case at bar the holders of the income bonds are entitled to have the interest paid, not exceeding five per cent., from the funds produced by net income, calculated as provided in the 8th paragraph of the mortgage; and that the discretion of the directors as to the application of any part of the earnings and income towards betterments, additions, or enlargement is controlled by the contract; and that the income bondholders have the right to demand the payment of their interest from the net income of each year, computable according to the contract method.

We will now proceed to apply these principles to the specific findings of the auditor, to which exceptions were made, and over-ruled by the court.

*Albany and Quincy survey; extra yard space, etc.* The sum of $6,894.44 was charged to operating expenses. Of this sum $4,-869.44 represents the cost of a survey for a line of railroad from Albany, Georgia, to Quincy, Florida. It was thought by the directors that it was necessary to build a railroad between these points to prevent the construction of a rival road calculated to seriously impair the business of the company. A railroad company called the Georgia Central & Gulf Railroad Company was chartered to build this road, but was never organized, and the project was abandoned. The auditor reported that if this railroad had been constructed it would have formed part of the amount paid for construction, and would have been a capital charge; as it was, nothing was done towards the construction of the railroad, and the survey, therefore, appears to have been, and was considered, an expense which drove off a competitor and helped the business of the company. Two thousand dollars were spent in the fiscal year 1906, and the auditor disallowed this sum, but the remainder of the item, to wit $2,869.44, the auditor allowed as an expense of operation. The other items complained of, representing $2,025, were paid, in the enlargement of the yard at Savannah, to a near-by land proprietor, who, because of this enlargement, was damaged by the shutting up of his right of way, and thereby his access was cut off, and for the purchase of land. The auditor reported that the sums paid for damages resulting from the enlargement of the yard and for the purchase of land were not chargeable against operating expenses. We think the money devoted to the payment of consequential damages, as well as yard enlargement, is not a proper charge against income. Nor do we think that the expenses incurred in making a survey for a new road, never built, are chargeable to operating expenses.

*Wrightsville and Tennille dividend.* The railway company received, during the fiscal year 1907, the sum of $10,405 as dividends upon the stock of the Wrightsville and Tennille Railroad Company, owned by it. The railway company did not include this amount in the income of the company for that fiscal year. It appeared that the railway company purchased this stock for the sum of $104,050,

and that at June 30, 1905, by successive applications of dividends to the purchase-money for the years prior, these shares of stock had been written down on the books of the railway company to a valuation of $13,952.14. In October, 1905, the railway company purchased the stocks and bonds of the LaFayette Railroad Company, in the State of Alabama, for the sum of $71,750. Instead of charging this purchase of the stock and of this railroad to capital or surplus account, the railway company marked up the valuation of the Wrightsville & Tennille stock by adding thereto this purchase of the LaFayette Railroad securities, and also added the value of some real estate in LaFayette, Alabama, which went with the purchase. After October, 1905, as further dividends were declared on the Wrightsville & Tennille stock, they were applied as credits against this purchase of the securities and real estate of the LaFayette Railroad. The auditor found that the railway company got practically nothing for this purchase, except that the LaFayette Railroad was a competing road, and it was gotten out of the way. He found further that none of the deductions stated in the 8th paragraph of the mortgage would cover this amount of money paid out for this property in Alabama, and that the dividend of $10,405 received from the Wrightsville & Tennille stock was erroneously applied by the railway company towards the purchase of the LaFayette property, and should be charged back and placed with the income of the railway company for the year 1907, thus increasing the amount of the gross income. Paragraph 8 of the mortgage provides that net earnings shall be ascertained by deducting from the gross earnings and income of the railway company's system, for each fiscal year, certain specified items. The dividend from the Wrightsville & Tennille Railroad stock when received by the company was a part of its income, and the charges against that income were not embraced in the specified items of deduction.

*Upper Cahaba reserve.* During the year 1905-1906 the railway company acquired, by purchase and construction, coal lands (subject to lease) and about twelve miles of railroad in St. Clair county, Alabama. Having no available funds, it borrowed the money by the issuance of $600,000 serial bonds. In 1907 the sum of $25,-109.95 was reserved out of the income of that year as a payment towards the retirement of this bond issue. Section 8 of the mortgage did not authorize the application of any part of its income to a

capital charge.   The purchase of coal lands and several miles of railroad is a capital charge, and should be paid from the other resources of the company.

*Lumber reserve.*   In the spring of 1903 the railroad companies in the Southeastern Freight Association territory made an advance in rates on yellow pine lumber of two cents per hundred pounds to points beyond the Ohio River.   Certain lumber manufacturers filed a bill in the circuit court of the United States for the southern district of Georgia, to enjoin this advance in lumber rates.   The Central of Georgia Railway Company was a party to this litigation. The litigation terminated by a decision of the Supreme Court of the United States, on May 27, 1907, adversely to the railway companies, and they were required to refund this overcharge.   The traffic department of the Central of Georgia Railway Company estimated that $150,000 was this company's proportion of the overcharge, and this sum was deducted by the railway company from its June earnings in 1907, and held as a reserve with which to pay in the future all claims allowed against the railway company for a recovery of this excess rate.   The auditor found that during the fiscal year 1907 the railway company received as a part of its gross earnings $50,000 from the excessive freight rate on lumber, and that, inasmuch as the gross earnings of 1907 were swelled by the sum of $50,000 from this illegal source, the company should deduct that sum from the gross earnings and hold it in reserve; but that the remainder, $100,000 should not be reserved out of the gross' earnings of 1907, because each fiscal year stands to itself, and that this sum of $100,000 was reflected in the surplus account of the railroad company, which, on June 30, 1907, amounted to $536,707.54. Accordingly the auditor found that the sum of $100,000 of this reserve does not belong to the accounting of 1907, and is not to be deducted from the gross earnings of that year.   We concur with the auditor upon this finding.

*Payment of equipment-trust obligations.*   The railway company paid out and reserved, for the year 1907, the sum of $704,170.49, for the retirement of equipment-trust notes.   The auditor found as a matter of law that the railway company was authorized to buy equipment to replace the old equipment, but was not authorized, under section 8 of the mortgage, to make additions to equipment. Accordingly, the auditor ascertained from the evidence that the

equipment had depreciated $464,060.72; and the difference between these two sums, i. e., $240,109.77, the auditor found was an overcharge in making payment of, or reservation for, the retirement of equipment-trust obligations for 1907. The auditor reported that no part of this sum which he found to be an overcharge could be considered as a reasonable betterment to equipment, as, under his construction of clause 8 of the mortgage, reasonable betterments did not include any additions to the railroad equipment. As we have already pointed out, we differ with the auditor in this respect. If the equipment represented by the equipment-trust notes was equipment authorized by the mortgage, that is, if that part of the equipment in excess of replacement was reasonable and proper to the economical and efficient operation of the railroad at the time it was purchased, it would have been allowable; and this was a question of fact for the auditor to determine.

*New power-plant and other items.* The power plant in the Savannah shops had become inadequate and practically worn out from service since 1855, and was displaced, and a new electrical power plant was installed. The railway company officials estimated that to have replaced the old power-plant with new machinery would have entailed a charge of $6,000. The new plant cost $38,490.84, and the auditor found that it was in no sense a replacement of the old, but was a distinct addition, and not a betterment in contemplation of paragraph 8 of the mortgage. Accordingly he disallowed the expense of the erection of the new power-plant, less the $6,000, as a deduction from income. The other items included eleven cabooses built in the company's shop, fifty ballast-cars, and the cost of a new steel hammer. This installation of machinery for transmitting electrical power to the tools used in the Savannah shops, instead of renewing the old steam plant, would be a betterment of the property used by the railway company, if the same was reasonable and proper for the economical and efficient operation of the road. It was a question of fact whether these items were properly comprehended as betterments under the definition we have given to this term as used in the mortgage.

It was alleged in the petition, that the net earnings and income of the Ocean Steamship Company for the fiscal year ending June 30, 1907, had been received by the railway company; that the directors of the steamship company were elected, controlled by, and

followed implicitly the directors of the railway company, who control the policy and actions of the steamship company, direct and control the bookkeeping and accounts of the steamship company, and have and exercise possession and control of its property, assets and franchises; and that the net earnings and income of the steamship company for the fiscal year ending June 30, 1907, are in fact and in substance the net earnings and income of the railway company, applicable under the terms of the mortgage to the payment of interest upon the bonds secured thereby. The steamship company and the railway company set up, in their respective answers, that they were separate and distinct corporations, each governed by its own board of directors; that the board of directors of the Ocean Steamship Company had the right, in their discretion, to say whether or not in 1907 a dividend should have been declared on the stock, and, having declared no dividend, there is nothing to be added to the income of the railway company from this source. The auditor found that the railway company had received as net earnings and income of the Ocean Steamship Company the sum of $543,399.22, which should have been included in the income account of the railway company. The court overruled the exceptions of the steamship and railway companies to this finding of the auditor.

Every corporation is a distinct legal entity, and, as such, owns the property belonging to it. Its stockholders are interested in its property to the extent of naming directors who shall manage its affairs and property, and in defining their powers, etc., but they are not owners of the corporate property. A corporation may have many stockholders, or it may have only one, and that one may be a corporation. A corporation owning all the stock in another corporation is a legal entity, separate and distinct from the corporation whose stock it owns. *Exchange Bank* v. *Macon Co.*, 97 *Ga.* 1 (25 S. E. 326, 33 L. R. A. 800). A sole stockholder is not entitled to demand the profits of the corporation until they have been set aside and ordered by the directors to be paid. The usual and proper way to appropriate corporate profits to stockholders is by declaring a dividend, but there may be a division of profits among stockholders without the formality of declaring a dividend. Such division of profits is the equivalent of a dividend. 2 Cook on Corporations, § 534. Where the profits of a corporation are actually

distributed among the stockholders by virtue of an agreement of all the stockholders, such distribution amounts to a mere division of the profits, and, as between them, it is good, and may not be attacked where the act does not impair the rights of third persons. Groh v. Groh, 80 App. Div. 91 (80 N. Y. Supp. 438). If the governing board of a corporation turns over its profits to the corporation's only stockholder without liability to account, this would be the equivalent of declaring a dividend. In effect the auditor found that the facts adduced on the hearing justified the conclusion that the steamship company had turned over to the railway company all of its profits earned during the fiscal year 1907, and that, notwithstanding no formal dividend was declared, the railway company, with the assent of the steamship company, received such profits as income from the stock, and such income should be considered in determining and ascertaining the fund available to pay the interest on the income bonds. Some of the salient facts established by the evidence upon which the auditor based his conclusion will be stated, after a brief reference to the organization of the steamship company, its relation to the old Central Railroad and Banking Company, and the purchase of its stock by the Central of Georgia Railway Company. In 1874 the president of the Central Railroad and Banking Company issued a circular to its stockholders, stating that the steamship company had been incorporated to operate the vessels which had theretofore been operated by the railroad company, and gave as a reason for obtaining this act of incorporation that it was doubtful whether the railroad company had the charter power to own and operate steamships. He further stated that to avoid all unnecessary expenses "as well as to continue the management of the property transferred [the vessels] substantially in the hands of your directors, the directors of the steamship company were selected from the directors of the railroad company." After outlining the relation of the railroad company to the steamship company, he summed up the whole matter as follows: "Thus it will be seen that your company is yet, for all practical purposes, the virtual owner of all the property which has been transferred to the Ocean Steamship Company." From the date of its birth the steamship company seems to have been absolutely dominated by the Central Railroad and Banking Company until that corporation passed into the possession and con-

trol of a receiver.   In 1895 the Central of Georgia Railway Company was chartered and organized.   It purchased all the stock of the steamship company, subject to an existing mortgage.   In one of its mortgages the railway company covenanted that it will not permit any increase of the capital stock of the steamship company, or the creation of any indebtedness by the steamship company for money borrowed, or the issue of any bonds by the steamship company or the creation of any lien upon the property of the steamship company, unless effective provision be made so that the evidence of such indebtedness and all bonds, any such liens, and all additional shares of the stock shall immediately upon their creation and issue be pledged by the railway company under its mortgage, to be held subject to all the trusts thereof.   The railway company further covenanted that it will not permit the steamship company to sell or otherwise dispose of its property, or lease the same, except to the railway company or to some other company of whose capital stock not less than 90 per cent. shall be then held by the railway company and pledged under its mortgage.   After its purchase of the stock of the steamship company, the railway company pursued substantially the same general policy of its predecessor in title in its relation to the steamship company.   The net earnings of the steamship company during the years 1896 and 1897 were paid in a lump sum as dividends to the railway company.   In 1898, 1899, and 1900 the surplus earnings of the steamship company were taken and used by the railway company, although no dividend for these years was formally declared.   Since 1900 no formal dividend has been declared, but the steamship company deposited its earnings to the account, and in the name, of the railway company in its bank.   The steamship company drew upon this account by the sufferance of the railway company for expenses, etc., but its net earnings were used by the railway company.   The directors of the steamship company were in the main chosen from the directors of the railway company, and both corporations have the same executive head.   There seems to be no dispute that prior to 1900 the apparent profits of the steamship company were turned over to the railway company and treated by it as income.   It is contended, however, by the railway company that since 1900 it received the net earnings of the steamship company as a deposit and not as profits on its stock.   It appears that the course of

conduct of the steamship company relating to the deposit of its earnings with the railway company was the same after 1900 as it was before that year. No corporate entry indicates any change. The president of the steamship company and railway company testified that prior to and including 1900 the apparent profits from the operation of the steamship company were turned over to the railway company and treated by it as income; since 1900 the money from the steamship company has been kept in the coffers of the railway company just as completely as money collected as fares from passengers. In January, 1908, a resolution was passed by the steamship company, ratifying and approving the method of turning its cash over to the railway company. No interest was ever paid on the moneys of the steamship company deposited with the railway company, though such moneys passed into the railway company's general funds. The able trial judge, in discussing these facts in an opinion filed with the decree under review, said: "Under this policy, not only the net earnings or surplus of the steamship company passed over to the railway and into its name and account, but all of its money went there. It is claimed that what up to 1900, with or without corporate action, had been dividends became under the operations of the policy a loan; and on January 8th, 1908, a resolution was adopted by the steamship board, reciting that the attention of the board had been called to the fact that for several years the practice had prevailed, by common consent, of turning over the money of the steamship company to the railway as a depository, and inasmuch as no formal authority had been given, the practice was then ratified. What the term 'common consent' means in this connection is not apparent. There is not the scratch of a pen, so far as shown in the books of either corporation, which so much as tends to show that the practice of turning over net earnings as dividends had ever been discontinued and a condition of loan substituted. For all part the steamship's company had in the arrangement, it might as well have never existed as a corporation. That the steamship company during these seven years was permitted to draw upon the railway's bank account for its daily sustenance but emphasizes the remarkable state to which its corporate entity had come, and the practical merger of that corporation in the dominant railway. Although it is insisted that it was a distinct, solvent, and effective

corporation, every cent it earned went into the hands of its stockholder, into its name and at its complete disposal—a loan to be returned by the railway to a corporation which it owned, when the railway permitted the demand to be made, and when the railway should acquiesce in the demand.   According to Mr. Hanson [the president of the railway company], 'If we had called on the steamship board and requested them to declare a dividend, they would have done it; but we made no such request.'   The dividend, if that was essential, was, therefore, within the absolute power of the railway, and the money was there to respond.   It was not even reserved for the use of the steamship company; it was actually put into the hands of the stockholder, which, at a word, would have received it as a dividend, but which at the will of one man took it over as a loan without the slightest corporate action from lender or borrower.   If the steamship company had used it or set it aside or done anything with it at all, there might be some appeal to the doctrine of corporate entity.   But it simply does not appear as income of the railway, because the railway's president will not have it so.   If it had come in as a dividend, it would have been subject to the claims of these income bondholders.   Coming in as a loan, the railway gets precisely the same use of it as if it had been declared a dividend, with no more real responsibility to return it, whilst the bondholder is held off by a word.   If there had been an entry on a book, it still would have been bookkeeping against equity.   There was not even that.   To hold that this can be done would make the rights of the cestui que trustent of these complainants depend, not upon the actual facts of the situation, but upon the choice of a bookkeeping term, to be used by the debtor in its own interest against the bondholder, who would have no control over the choice of words.   Followed to its ultimate expression, there need be no moment when, if it meets the obstructive whim of a policy, such net profits, however extensive, however unincumbered, might not be put beyond the reach of the bondholder by the transmutation of 'income' to 'loan,' with no change of practical results to the railway save the defeat of the bondholder.   It would be an obsession of terms to disregard the real relations of these corporations—the absolute subordination of the one, the complete dominancy of the other, and confine our observations to the label rather than the object it affects to proclaim.   Income is none

the less income because some one chooses to call it a loan. The disregard for corporate entity is illustrated by other acts which appear in the record. For instance, legislation by the railway on the affairs of the steamship company before the matters were so much as submitted to the steamship board; action by the board itself, subject to the approval of individuals who were apparently the owners of the railway stock. Not only were the intimate affairs of this corporation thus administered by the owner of its stock, every cent of its money put into the name of the owner of its stock, but even its credit was taken away. Although solvent and making money, its purchases were made not on its own credit but on that of the railway, which but for the money of the steamship company would have experienced difficulty in meeting its obligations. Where the real party at interest itself disregards corporate entity to its own advantage, it will scarcely be permitted in a court of equity to invoke the doctrine to shield it against the party which has suffered through such disregard." Where the sole stockholder of a corporation receives and uses for his own account the net profits of the corporation, a court of equity in deciding the effect of such transaction will look through the veil of mere formalism and treat as done with formality that which is accomplished in fact without formality, where the interests of third persons are not affected. The net income of the steamship company in the hands of the railway company was just as effectually the property of the railway company as if it had been declared as a dividend. The railway company used it as its own money, and the steamship company by its conduct acquiesced in the use. The auditor was authorized to find from the evidence that the net earnings of the steamship company for the year 1907, which were turned over by it to the railway company during that year, were income of the railway company by virtue of the course of conduct of the two corporations, although such profits were not formally declared to be a dividend.

The auditor reported, and the court decreed, that the sum of $10,750 be allowed to the Central Trust Company of New York and $13,000 be allowed to the Manhattan Trust Company of New York, in full compensation for all services rendered by the trustees, including expenses, disbursements, and counsel fees, to be paid by the Central of Georgia Railway Company. The railway company excepts to these allowances to the trustees. The 11th

paragraph of the mortgage provides that "The trustees shall be entitled to reasonable compensation for all services they may render in the execution of the trusts of this mortgage to be paid by the railway company and its successors, and for which the trustees shall have a lien on the property mortgaged." It is contended by the trustees that under this provision they are entitled to be compensated for all services rendered by them in the execution of their trusts, including necessary disbursements and counsel fees paid out or incurred. The railway company, on the other hand, contends that the trustees are not entitled under the terms of the mortgage to be paid anything except in the way of compensation to them for strictly trustees' services, and are to be allowed nothing for disbursements or counsel fees. By the terms of the 8th paragraph of the mortgage, in case the differences between the trustees and the railway company cannot be adjusted, it is provided: "then and in that event it shall be lawful for and *the duty of* the trustees to file a bill in equity against the railway company, in any court of competent jurisdiction, for an account of the net earnings and income under the provisions of this mortgage." The railway company, in executing the mortgage, imposed the duty upon the trustees to file an equitable proceeding to bring about an adjudication as to whether or not there were net earnings and income available under the terms of the mortgage, over and beyond the amount claimed by the railway company in its statement in case of such disagreement. The trustee is a corporation, and necessarily could not discharge this duty except by the employment of counsel skilled in the law; and in the conduct of the litigation it might become necessary to employ the services of experts. Having produced a fund improperly withheld by the railway company, available to pay the interest upon the income bonds, the trustees clearly are entitled to compensation not only for their strictly trustees' services but also for proper disbursements and for attorney's fees incurred in the prosecution of this action. It was not disputed that disbursements, apart from the compensation of the trustees and counsel fees, were made. The allowance is to cover such disbursements, as well as compensation to the trustees and counsel fees. Nor do we think the amounts excessive. The litigation immediately involved about $285,000 of interest sought to be recovered; but the effect of the adjudication is far more ex-

tensive than a recovery of this large sum. The contract is yet to run fifty years, and its construction by the court will tend to avert recurring conflicts for each year.

The auditor reported that the railway company was liable to the trustees on the unpaid interest on the income bonds at the rate of five per cent. per annum. The court sustained the exceptions of the railway company to this finding. The bond provides that its principal shall be paid, "with interest thereon from November 1st, 1905, at a rate not exceeding five per cent. in any one fiscal year, payable at the . . office or agency, on October the 1st of each year, when declared to be earned and due. Such interest is non-cumulative, and shall be payable only out of the net earnings and income of the said railway company applicable for such purpose, when and as the same shall be ascertained and fixed for each preceding fiscal year in the manner and upon the conditions provided in the mortgage securing these presents." The 8th paragraph of the mortgage provides that the interest declared by the directors shall be paid on the 1st day of October. The directors rendered a statement to the trustees as to the amount of net earnings and income applicable to the payment of interest on the bonds. The amount as reported was unsatisfactory to the trustees; and they filed their action in accordance with the provisions in the 8th paragraph of the mortgage. The mortgage provides: "If it shall be adjudged in such action that there are such net earnings and income available, under the terms of this mortgage, for the purpose of paying the interest on the bonds secured by this mortgage, beyond the amount declared in the statement so furnished by the railway company, then, unless the railway company shall, within three months after such adjudication, pay the said balance of net earnings and income so adjudged to be available by way of interest to the holders of bonds hereby secured, not exceeding the maximum percentage allowed in any one fiscal year, such non-payment shall constitute a default in the payment of interest, for which the trustee shall be authorized to proceed to enforce this mortgage. The remedy herein provided for ascertaining the amount of the net earnings, in case of dispute, shall be exclusive of all other proceedings, actions, suits, and demands whatsoever." Under the contract there was no default in the payment of interest until after the lapse of three months after the adjudica-

tion. It required the adjudication of the court to liquidate the amount of the interest coupon. Unliquidated demands do not bear interest, and a demand becomes liquidated only when by agreement or otherwise the sum to be paid is fixed or certain. Civil Code, § 2884; *Nisbet* v. *Lawson*, 1 *Ga.* 287; *Roberts* v. *Prior*, 20 *Ga.* 561. We concur in the ruling of the court sustaining this exception to the auditor's report.

In its decree the court fixed the compensation of the auditor at $10,000, and the stenographer for all services rendered to the auditor at $750, to be paid equally by the trustees and the railway company. The trustees except to that part of the decree which provides that the compensation of the auditor and stenographer shall be borne equally by the complainants in the two causes on the one part and the defendant railway company on the other part, on the ground that the decree of the court was wholly in favor of the trustees except as to that part of the exception touching the allowance of interest. The railway company also excepts to the allowance of $10,000 to the auditor as excessive. It was stipulated between counsel, which stipulation was approved by the court and made the judgment of the court in the consolidated cases, that in taxing the auditor's fees as required by law the court may in his discretion, if he shall deem it proper to do so, fix the auditor's compensation at an amount in excess of the maximum prescribed by § 4602 of the Civil Code. When we consider the importance of this litigation, the effect of its result upon the future management of the railway company, the great degree of legal skill required in deciding the issues, and the time necessary to digest the very voluminous record, we do not think the amount allowed the auditor by the court is unreasonable. Nor do we think that the court erred in apportioning this expense between the litigants. This is a matter within the discretion of the court, as has been frequently decided by this court.

The parties stipulated in the mortgage that the trustee might institute and maintain an action for an account of the net earnings and income under the mortgage. This right is neither challenged nor disputed. Therefore it would be irrelevant to enter into a discussion of the right of the trustee to bring this suit independently of the contractual permission. For this reason we forbear a discussion of, or any decision upon, the rulings of the auditor as to

the existence of a trust relation between the railway company and the income bondholders in the ascertainment of the fund available for interest, or whether the contract equitably assigned net earnings to the bondholders. The rulings of the auditor upon these matters are only incidental to the trustee's right to an accounting, and become immaterial in view of the defendants' acquiescence in the trustee's right to prosecute the action.

The purpose of the action was for an adjudication that there are net earnings and income available, under the terms of the mortgage, for the payment of the interest for the fiscal year ending June 30, 1907, beyond the amount declared in the statement of the railway company. The fund available for the payment of the interest as reported by the auditor, exclusive of the items relating to the payment of the trust equipment notes and the Savannah shop, being in excess of the sums decreed to be paid therefrom, the judgment of the court is *affirmed* in each case, on both main and cross-bills of exceptions.

*All the Justices concur, except Atkinson, J., disqualified.*