## E. M. T. Coal Company, et al. v. Rogers, et al.

(Decided June 4, 1926.)

### Appeal from Daviess Circuit Court.

1. Sales—Seller's Promise to Give Buyer Preference in Buying Coal Held Not to Bind Seller to Give Buyer First Call Over an Indefinite Period to Any Surplus Coal Seller Might Wish to Sell.—Promise by seller, unsupported by consideration to give buyer preference in buying coal seller might want to sell to others than its regular customers, held not to bind seller to give buyer first call over an indefinite period to any surplus coal it might wish to sell.

2. Corporations—Corporation's Release of Subscribers from Stock Subscriptions, for a Consideration, Held Valid, where there was no Fraud on Existing or Subsequent Creditors (Ky. Stats., Section 544).—Corporation's release of subscribers from obligations of stock subscriptions in consideration of their release of corporation of all claims for their stock or rights as stockholders, held valid, where there was no fraud on existing or subsequent creditors; Ky. Stats., section 544, relative to corporation's purchase of its own capital stock. being inapplicable.

3. Corporations—Reduction of Subscriptions of Stockholders Held Valid, where Corporation had no Debts, and Had Done no Business, and Reduction was with Consent of all Stockholders.—Reduction of subscriptions of stockholders held valid, where corporation had no debts, and had done no business, and reduction was with consent of present and incoming stockholders.

4. Corporations—Creditors of Corporation had no Cause for Complaint, Because Corporation, when Solvent, Took Notes of One Stockholder in Lieu of Notes of Others.—Creditors of corporation had no cause for complaint because corporation took notes of one stockholder in lieu of notes of two others who were withdrawing from corporation, at time when corporation was solvent and maker of note was well worth its value.

5. Corporations—Creditors Cannot Complain that Corporation, when Solvent, Distributed Dividends to Retiring Stockholders Under Pretended Payment of Salaries, to Avoid Complication with Federal Income Tax Law.—Creditors cannot complain that corporation distributed profits by way of dividends to retiring stockholders under pretended payment of salaries to avoid complication with

federal income tax law, where distribution was made at time when corporation was solvent, and amply able to make it.

E. B. ANDERSON for appellant E. M. T. Coal Co.

BARNES & SMITH for appellants Broadway Coal & Ice Co. and Bell. Union Co.

OTTO C. MARTIN for appellant Crowe & Kelly.

T. F. BIRKHEAD for appellant Bellamy.

SANDIDGE & SANDIDGE and WOODWARD, WARFIELD & HOBSON for appellees.

OPINION OF THE COURT BY JUDGE DIETZMAN—Affirming.

On February 3, 1922, the appellees, A. D. Kirkpatrick, Carlisle Kirkpatrick, W. W. Bridges, J. L. Rogers, J. B. Torbert and a man by the name of J. M. Thompson, who was at the inception of this suit a party to it, but because of his insolvency was later dismissed from the same, executed, acknowledged and had recorded articles of incorporation by which the Service Fuel Company was incorporated with an authorized capital stock of $100,-000.00, divided into 1,000 shares of the par value of $100.00 each. Of this authorized capital, the articles recited that each of the six incorporators subscribed for 166 shares, except Rogers and A. D. Kirkpatrick, who each subscribed for 168 shares. The reason for the organization of this company was to bring together for the purpose of sale the output of certain coal mines in which these six gentlemen were interested. They thought that if a central selling agency or brokerage company were thus established, better selling connections, especially in the north, could be made by reason of the control of a larger output of coal than any one of the constituent mines could supply. As the coal business was then in the doldrums, these men figured that by this expedient they could stimulate the sales of their respective properties to their profit. The Service Fuel Company was purely a brokerage concern. After the articles of incorporation had been filed and a certificate of incorporation issued by the Secretary of State, these men, during February and March, held a number of meetings at which they adopted by-laws, elected officers and directors, the number of which by the by-laws was fixed at four, with

three being requisite for a quorum, and laid plans for the future conduct of the company's affairs. The two Kirkpatricks, Rogers and Torbert each paid into the company $500.00, for which they each received five shares of its capital stock. The money thus raised was used in opening an office and providing office furniture and equipment. On April 1st following, a strike occurred in the central competitive coal field in Illinois and Indiana, as a result of which coal became very scarce and high in price. Any coal mine was able to sell at an excellent profit all the coal it could produce. The two Kirkpatricks, Bridges and Thompson decided that there was no need for the services of the corporation organized in the previous February, but Rogers and Torbert were rather anxious to go ahead with it. The two latter interested in the matter Jos. M. Taylor and Chas. O. Fowler of Chicago. These last two named gentlemen were brothers-in-law, and Mr. Fowler enjoyed the reputation of being a most successful coal salesman in the Chicago territory. After some negotiations, it was agreed that Thompson, Bridges and the two Kirkpatricks should be by the corporation released from their subscriptions of stock to the company; that Torbert and Rogers should take over the ten shares of stock the two Kirkpatricks had paid for and that Fowler, Taylor, Torbert and Rogers should each subscribe and pay for 125 shares of the authorized capital stock of the company; Torbert and Rogers to be released from the excess of their original subscription of 168 and 166 shares respectively. It is thoroughly established by the evidence introduced that Fowler and Taylor would not have come into the company as minority stockholders and that they insisted that they be on an equal footing with Rogers and Torbert. These four parties agreed to take the $50,000.00 of stock thus subscribed for in order that the company could go ahead and do business under that section of our statutes which requires 50 per cent of the authorized capital stock to be subscribed and paid for before a company is authorized to do business with those other than its own stockholders. Of course after this arrangement was carried out, as it was, the company had then forever put out of its power to deliver to Bridges, the two Kirkpatricks and Thompson the stock they had originally subscribed for, because there was not enough stock left after the division of

$50,000.00 thereof among Fowler, Taylor, Rogers and Torbert to satisfy such subscriptions. On April 24, 1922, four individual contracts were drawn up between Bridges, the two Kirkpatricks and Thompson, respectively, on the one side, and the six original incorporators purporting to act as directors and stockholders on the other side, cancelling and releasing the stock subscriptions of Bridges, the two Kirkpatricks and Thompson. At that time there were no stockholders or directors of the company other than these six men, nor were there any creditors, and the company had done no business with one possible exception. It seems that on this April 24th, 1922, the appellant, E. M. T. Coal Company, shipped to the Service Fuel Company or its order eleven carloads of coal which it now claims were shipped on a contract made prior thereto with the Service Fuel Company represented by Torbert, and itself, represented by its agent McHargue. This shipment of coal was paid for in May following. The E. M. T. Coal Company, however, claims that the contract thus entered into between it and the Service Fuel Company was one whereby it agreed to sell to the Service Fuel Company all of its surplus output, and that certain debts due it from the Service Fuel Company, which were created after this April 24th and which are in litigation here, arose out of this contract entered into prior to April 24th. A careful reading of McHargue's testimony, which is all that there is on the subject, except Torbert's qualified denials, plainly demonstrates that there was no binding or valid contract as the E. M. T. Coal Company now contends. At its best, McHargue's testimony only goes to the extent of a promise on the part of the E. M. T. Coal Company, unsupported by any consideration, to give to the Service Fuel Company the preference in the buying of any coal the E. M. T. Coal Company might want to sell to others than its regular customers. No set time for the duration of this promise is indicated. The coal company never agreed nor bound itself to deliver one pound of coal to the Service Fuel Company, nor were any prices for the coal fixed. We are convinced that the whole transaction was simply a promise, which did not bind the E. M. T. Coal Company to give to the Service Fuel Company the first call over an indefinite period to any surplus coal it might wish to sell, and that the obligations here set up arose only on the sale of each carload of coal involved.

Therefore, it is plain that on April 24, 1922, the Service Fuel Company had no outstanding debts or liabilities which have not been settled in full and that all its stockholders agreed to release the four men as indicated.

The evidence also clearly establishes that on the release of these four men, the two remaining original subscribers and the two new stockholders, being then all the existing stockholders, agreed that each one of them should have but 125 shares of the capital stock of the company and the two former subscribers who had subscribed for more should not be held to such subscriptions. This agreement, however, was never reduced to writing. On this April 24th, Rogers and Torbert held a directors' meeting, in which they undertook, first, to ratify and approve the contract releasing the four men who had given up their connection with the company; secondly, to elect Fowler and Taylor directors of the company; and, lastly, to fix the salaries of themselves and these two new directors at $300.00 a month. Fowler, Taylor, Rogers and Torbert each executed to the company their respective notes in the sum of $12,500.00 each for their stock subscriptions. Anticipating that their company would require quite a line of credit, these four men discounted these notes with a bank in Nashville; the proceeds of the discount being placed to the credit of the Service Fuel Company. At the same time, the Service Fuel Company agreed with the bank that if the bank would extend to it a line of credit running from $150,000.00 to $200,000.00 the fuel company would leave this $50,000.00 as a special deposit with the bank not to be checked out. The bank agreed to pay the Service Fuel Company four per cent interest on this special deposit. As events turned out, however, the Service Fuel Company never had any occasion to borrow from the bank, because, on account of the abnormal conditions arising out of the strike it was able to sell coal so rapidly, and to collect for the same so promptly, that it had no need for credit accommodations. The evidence shows that from the time the company got started well into business along in May, 1922, up to January, 1923, it did about $4,000,000.00 worth of business. In October of 1922 the four men then interested in the company, and who had been paying six per cent interest on their notes to the bank, decided that, inasmuch as the Service Fuel Company then had to its credit in various banks over $150,000.00 which it did not especially need,

the company might as well make the six per cent on the notes held by the bank instead of the four per cent which the bank was paying on the special deposit. As the company had no need for credit accommodation, there was no necessity for its maintaining any longer this special deposit with the Nashville bank; and so the corporation drew its check to the bank on this special deposit and the bank assigned to the corporation the four notes in question.

In November, 1922, Fowler, who theretofore had been acting as the sales agent for the Monroe Warrior Coal Company, had to decide whether he would give up that agency or sever his connections with the Service Fuel Company, since the former company was no longer willing to divide his services. About this time his brother-in-law, Taylor, came to Kentucky, where the books of the Service Fuel Company were kept, and there made an exhaustive audit of these books, which audit was embodied in a report as of November 30, 1922. About this time, too, Torbert sold out his interest in the coal mines in Kentucky in which he was interested and planned to remove to New York. For this reason he was desirous of disposing also of his interest in the Service Fuel Company. Negotiations were begun between Fowler and Torbert and a statement of the accounts receivable and accounts payable of the Service Fuel Company as of December 31, 1922, was taken off the books. It seems to be conceded in this record that the net worth of the company was represented by the difference between these two accounts. The four notes which the company had bought from the bank in October did not appear in this statement, nor is any complaint made of that fact. The net worth of the company as thus arrived at was $68,000.00. When Rogers learned that Torbert was on a dicker for the sale of his stock, he, too, began negotiations with Fowler and Taylor for the sale of the stock which he owned, as he did not wish to remain as a minority stockholder in the company. Fowler and Taylor were willing to buy the interests of Rogers and Torbert if they could agree upon a price. Figuring that their interest in the company was worth not only the par value of their stock, but also a proportionate share in the net worth of the company, or $17,000.00 each, Torbert and Rogers at first

demanded the return of the notes they had executed for their stock and $15,000.00 each in cash additional. Fowler countered with an offer of the notes and $10,000.00 each. Torbert was anxious to get away to New York and so, after considering the matter overnight, he acceded to Fowler's proposition. Rogers not wishing to be left a minority stockholder in the company likewise agreed. Two identical contracts were then drawn up dated January 3rd, 1923, to one of which Rogers was a party and to the other of which Torbert was a party and to both of which Fowler and the Service Fuel Company were parties. In these contracts it was stipulated that Rogers and Torbert should transfer their respective shares of stock to Fowler; that Fowler should see to it that their notes were returned to them and that they were each paid $10,000.00 in cash; and that the Service Fuel Company should see to it that all the debts of the company then outstanding were paid. It was further provided that Torbert and Rogers should not be required to turn over their stock until Fowler and the Service Fuel Company had performed what they had undertaken to do. However, on February 28th, 1923, Rogers, Torbert and Fowler performed their respective parts of these contracts, although the Service Fuel Company had not then paid $19,000.00 of a very large amount of debts outstanding as of previous January 1st. A directors' meeting had been held on the 28th of December, 1922, ratifying and approving what had transpired at the meeting of April 24, 1922. On February 27th, 1923, another directors' meeting was held at which the resignations of Rogers and Torbert as officers of the company were accepted. At this meeting it was also voted that the company should pay Rogers and Torbert each $10,000.00. In order to escape complications in the income tax returns of Rogers and Torbert, this resolution, on advice of the company's lawyer, instead of appearing in the minutes of this meeting, was put in minutes of a meeting which by its date purported to have been held on the preceding April 24th, 1922. The resolution was also tricked out in this fashion. Instead of a declaration of a dividend or distribution of profits to Rogers and Torbert by the consent of all of the stockholders and directors then of the company the resolution purported to vote as of April 24th, 1922, to Rogers and Torbert and certain men designated by them, among whom were the appellees, Lon

Rogers and Fon Rogers, salaries for services as employees of the company. Although there was an attempt in the evidence to show that these designated persons did perform some services for the company between April 24, 1922, and February, 1923, the effort was very feeble. The truth of the matter is that the form of this resolution was just a sham to disguise the true transaction, which was a distribution of profits to Rogers and Torbert. Whether it be called a rose or not, the odor is the same. On Rogers' and Torbert's retirement, Fowler and Taylor took charge of the company; immediately voted themselves large bonuses for past services, raised their salaries from $300.00 to $800.00 a month and embarked on a program of expansion which involved large expenditures. At the time the company surrendered to Rogers and Torbert their respective notes in February, Fowler gave to the company his note in lieu thereof for $25,000.00. The record indisputably establishes that Fowler at this time was well worth this amount; that the company was then solvent and was not rendered insolvent by the distribution to Rogers and Torbert of the $20,000.00 in cash. The coal strike having been settled in the fall of 1922, 1923 was a very dull year for the bituminous coal industry. The sales of the Service Fuel Company markedly fell off, whereas its expenses just as markedly increased. By January, 1924, it was hopelessly insolvent. A number of creditors of the Service Fuel Company then brought various suits, which were later consolidated together into this one, against the six original incorporators of the Service Fuel Company. By these suits it was sought to collect from Carlisle Kirkpatrick, Bridges and Thompson their alleged unpaid stock subscriptions of $16,600.00 each, and from A. D. Kirkpatrick his subscription of $16,800.00. As to Rogers and Torbert it was sought to collect their respective stock subscriptions from them, and, in addition, to recover back from them and the remaining appellees herein the $20,000.00 paid them in February, 1923. From a judgment dismissing their petitions these creditors have appealed.

The first question we have to determine is whether or not the release of Bridges, the two Kirkpatricks and Thompson from their stock subscriptions was valid and binding. This was not a purchase of the capital stock of the corporation by itself, which is forbidden by section

544 of the statutes, but was a release of a stock subscription given when the company had done no business, when there were no creditors and with all of the directors and stockholders of the corporation agreeing. That being true, the case comes squarely within the rule laid down in Scottish Security Company's Receiver v. Starks, 117 Ky. 609, 78 S. W. 455. In that case Starks signed the articles of incorporation of the Scottish Security Company, subscribing for twenty shares of its stock. On being sued on his stock subscription, he claimed that he had been released from his subscription by the parol consent of all the stockholders. The lower court instructed the jury:

"The court instructs the jury that when the defendant, John P. Starks, signed the articles of incorporation of the Scottish Security Company he became a subscriber for twenty shares of the capital stock of said company and they should find for the plaintiff in the sum of $1,800.00, with interest from the 12th day of November, 1901, unless they shall believe from the evidence that after the said company was incorporated all of the persons then holding or owning stock in said company agreed or consented that the defendant should not be held upon his said subscription, and that the twenty shares of stock subscribed for by him was by reason of the said agreement or consent, if such there was, issued to other persons and that the company did not then have any outstanding debts. If such is the fact, then they should find for the defendant."

We held that this instruction admirably stated the law of the case. In this opinion we quoted with approval from Cook on Corporations, section 169: "By unanimous consent of the stockholders a subscription may be cancelled and a subsequent creditor of the corporation cannot complain." In 2 Fletcher's Ency. of the Law of Private Corporations, section 638, it is said:

"There can be no doubt that a corporation may effectually release a subscriber from liability on his subscription in whole or in part or allow him to modify his contract if all the stockholders expressly or impliedly consent, and if there is no fraud upon existing or subsequent creditors, and subject to the

further requirements that there has been given a consideration for the release and statutory provisions on the subject are complied with.''

To this section are appended the authorities supporting this rule from a great number of the states, including those of Illinois, New York, Ohio and Pennsylvania. It therefore results that the release of Bridges, the two Kirkpatricks and Thompson was valid and binding. It was given for a consideration. These men released all claim they had against the corporation for their stock or any rights as stockholders, and, in return, the corporation released them from their obligations on their subscription. The company had done no business and there were no creditors, except possibly one, which we have mentioned and who has been paid. No fraud is shown upon any existing or subsequent creditor. All of the directors and stockholders agreed. In the Starks case the release was by parol, under the authorities above cited such a parol release is good.

For the same reasons, the reduction of the subscriptions of Rogers and Torbert was also valid and binding. It was made at the same time and as a part of the same transaction as the release of the Kirkpatricks, Bridges and Thompson and thus at a time when the company had no debts, had done no business and was made with the consent of, not only all the then stockholders, but also of those who were coming in as new stockholders. We therefore conclude that the lower court was correct in holding that these transactions were valid transactions and afforded no basis for complaint on the part of the appellants.

So far as the transaction of the notes is concerned, wherein the notes of Rogers, Torbert, Fowler and Taylor were first discounted in the Nashville Bank and then later bought back by the Service Fuel Company, which in turn surrendered them in February, 1923, to Rogers and Torbert taking in lieu thereof the note of Fowler, we find no just cause of complaint on the part of these appellants. Whether or not the discount with the Nashville Bank and the purchase by the Service Fuel Company should be regarded merely as a colorable transaction and whether or not after the Service Fuel Company had bought these notes from the bank, it should be regarded as holding

them as stock subscriptions rather than as ordinary obligations of Rogers and Torbert, we need not decide. The evidence shows that the corporation was amply solvent in February when it took the note of Fowler in lieu of the note of Torbert and Rogers. Fowler was, as the evidence shows, well worth the note he gave the company for the notes of Rogers and Torbert it surrendered. This being true, the case comes within the rule laid down in Boulware-Allen Shoe Co. v. Morris, 168 Ky. 426, 182 S. W. 225. There the stockholder of a solvent corporation who owed to that corporation one-half of his stock sub-scription, which debt was evidenced by a note, sold his stock to a buyer who paid him one-half cash and the rest by giving her note to the corporation in lieu of the seller's note. Later the company became insolvent. Its trustee in bankruptcy then brought suit against the original stockholder for the one-half of his original stock subscription which had been evidenced by his note which the company had surrendered to him when it took the note of his vendee in lieu thereof. The suit was bottomed on the theory that the defendant was liable under section 547 of the statutes, because his stock subscription was unpaid to the extent for which suit was brought. We held that, as the company was solvent at the time it surrendered to the defendant his note and took that of his vendee, who, so far as the evidence indicated, was then good for it, no fraud was worked on any of its creditors and the exchange of the notes was a valid and binding transaction. We further held that the original stockholder had thus been released from further liability on his note to the company, and its trustee in bankruptcy had to look to the vendee on her note. Therefore, there is no merit in the complaint appellants make on this score.

With reference as to what happened in the directors' meeting on February 27, 1923, it must be remembered, as stated, that the corporation was then solvent and amply able to make distribution from its surplus of the $20,000.00 it did to Rogers and Torbert. This distribution was made by a formal order and vote of the directors. It is true they voted this distribution under the pretended payments of salaries, whereas and in truth it was a distribution of profits by way of dividends to the retiring stockholders. No rights of creditors or stockholders were then involved. Had the distribution been

declared as a dividend no creditor here before us could now complain. In Redhead v. Iowa National Bank, 127 Iowa 572, it was held that a resolution of a bank to the effect that the bank should pay the taxes on the bank stock was equivalent to the declaration of a dividend equal to the taxes which might be levied on each share where the bank was under no legal obligation to pay such tax. In 6 Fletcher on Corporations, sec. 3673, may be found a collection of cases sustaining the proposition that a division of profits will be deemed and considered in truth such and a dividend though it may not be called such by the directors or the corporation making such distribution. It is obvious in this case that the directors, who were all of the stockholders of the company intended the distribution of this $20,000.00 as a dividend; they considering it as that part of the surplus apportionable and belonging to that part of the stock owned by Torbert and Rogers. The directors started out to make the distribution as a dividend but later, on advice of counsel, hid it under the form indicated in order to avoid complications with the federal Income Tax Law. But whatever they called it, it was in truth a dividend or distribution of surplus, and, being declared and distributed at a time when the rights of no creditor or any stockholder were prejudiced thereby, and at a time when no creditor could have complained, had it been declared as a dividend, it follows that there was nothing in the transaction either of which the present appellants may complain.

It therefore results that the judgment of the lower court in dismissing the appellants' petition was correct and it is affirmed.