H. E. ENGLISH et al., Appellants,

v.

RAMO, INC., et al., Appellees.

No. 17663.

Court of Civil Appeals of Texas,
Dallas.

Oct. 29, 1971.

Rehearing Denied Dec. 30, 1971.

Ralph W. Currie, Muse, Currie & Kohen, Logan Ford, Burford, Ryburn & Ford, Louis P. Bickel, Johnson, Bromberg, Leeds & Riggs, J. Robert Norris, Jr., Jackson, Walker, Winstead, Cantwell & Miller, Dallas, for appellants.

Robert G. Vial, Peter Winstead, Akin, Vial, Hamilton, Koch & Tubb, Dallas, Mary Joe Carroll, Clark, Thomas, Harris, Denius & Winters, Austin, for appellees.

GUITTARD, Justice.

This case begins with the sale of all stock of Red Ball Motor Freight, Inc. by appellants, H. E. English and members of his family, to appellee Ramo, Inc. Ramo's principal stockholder, appellee TeleCom Corporation, guaranteed the purchase-money notes. We hold that appellants are entitled to accelerate the notes and that appellees are entitled to an offset for breach of express warranty in the amount found by the jury.

The purchase price was $15,500,000, including $4,000,000 cash and Ramo's notes aggregating $11,500,000: At the time of trial Ramo had paid $3,188,000 on the notes and no payments were due. Appellants sought to accelerate the balance of $8,-312,000 and to foreclose their lien on the stock because of alleged breaches of the "Noteholders Security Agreement." Appellees denied any breach of the security agreement and prayed for judgment declaring that no ground of acceleration existed, and also claimed offsets for breach of ex-

press warranties made at the time of the sale. After a jury trial, the district court denied acceleration and allowed an offset in the amount found by the jury for one breach of warranty, but denied appellees' claim for another breach of waranty. Both sides present points of error. The facts and law relating to each phase of the appeal will be discussed separately.

### 1. *Appellants' Claim for Acceleration.*

One of the breaches of the security agreement claimed by appellants was Red Ball's advances to Ramo from time to time of funds amounting to $2,272,376. Appellants contend that these advances were dividends forbidden by the security agreement. Appellees insist that they were not dividends but were inter-company loans permitted by the agreement. We hold that they were forbidden dividends.

The dividend limitation appears among the "covenants" of the debtor (Ramo) in Section 7(e), as follows:

"Debtor may likewise cause Red Ball to declare and pay cash dividends to Debtor on its outstanding capital stock, except that such dividends may only be declared out of profits accruing after the date of this agreement, and no dividends shall be declared or paid which would reduce the continued capital and surplus of Red Ball and its subsidiaries below the aggregate capital and surplus, as of March 31, 1968."

Appellees admit that the amounts alleged were advanced to Ramo from funds other than profits accruing after the date of the agreement.

To establish breach of this covenant as a default authorizing acceleration, appellants rely on the following provision in Section 5(e) of the security agreement:

" * * * if the Debtor defaults in the performance of any covenant, condition or agreement contained in this Agreement, and if such default mentioned in this paragraph shall not have been reme-

died to the satisfaction of the holders of the Notes issued hereunder, within thirty (30) days after written notice thereof shall have been received by the Debtor from such holder or holders, same shall constitute an act of default."

There is evidence that notice of default was given and that no satisfactory cure was effected within thirty days.

### a. *Evidence to Support Jury Finding.*

The court submitted to the jury as Issue No. 18 the following:

"Do you find from a preponderance of the evidence that on the occasion of each transfer of funds of Red Ball to Ramo aggregating an amount of approximately $2,272,376, Ramo at that time had no intention of re-paying the same?"

The jury answered "Ramo did not have intention to repay." In rendering judgment denying acceleration, the trial court sustained appellees' motion to disregard the answer to Issue No. 18. Appellants contend in their first point that there is evidence to support the jury's finding. We agree.

The evidence is substantially without dispute. When the sale was closed and the security agreement was signed on June 21, 1968, Red Ball's books showed undistributed profits of more than $2,250,000. On June 24, the next business day, Ramo withdrew $1,500,000 in cash from Red Ball's account. Ramo gave Red Ball no note and made no agreement to pay interest. No resolution of Red Ball's board of directors authorized a loan to Ramo and no resolution of Ramo's board authorized borrowing any amount from Red Ball. The only formality was a notation on Red Ball's books of $1,500,000 "advance receivable" from Ramo, and on Ramo's books of the same amount as an "advance payable to subsidiary." The withdrawal was made on order of Grogan Lord, chairman of the boards of Red Ball, Ramo and TeleCom, and chief executive officer of all three.

After this first advance, Red Ball's checks were used from time to time to pay Ramo's

obligations, including interest payments on the notes held by appellees, until on October 1, 1969, the total came to $2,272,375. In each instance there was no formality other than notations on the books of Red Ball and Ramo.

Grogan Lord and other officers of Ramo testified that they intended for Ramo to repay the advances to Red Ball. No method of funding such repayment was planned or even discusseed. Lord testified that the three companies were all part of TeleCom and were "just like one company." He said that since the indebtedness was not owed to outside interests, repayment was a matter of inter-company decision, that how the funds were used was a responsibility of management, and that they would be applied to the best interest of the stockholders.

There is no suggestion that Red Ball's affairs were managed by an independent board of directors. Five of the six Red Ball directors were also directors of Tele-Com and four were directors of Ramo. Ramo picked Red Ball's directors and determined its financial policy. All of Red Ball's stock was owned by Ramo and 89 per cent of Ramo's stock was owned by Telecom. Although at the time of the sale, Red Ball had a substantial surplus in its treasury, Ramo had operated at a loss since TeleCom had acquired the majority of its stock in 1965, and its operations both before and after the sale depended on TeleCom's financial support.

■ This evidence was enough to justify the jury in concluding that notwithstanding the book entries and the testimony of Ramo's officers concerning Ramo's intention to repay, the consideration controlling repayment was the financial interest of TeleCom's stockholders, and that there was in fact no intention to repay at the time the advances were made because such repayment would not be in the stockholders' interest. Consequently, appellants' first point is sustained.

*b. Interpretation of Dividend Limitation.*

■ Whether this finding is controlling on the ultimate issue of breach of the security agreement is a more difficult question. Appellees contend that Ramo's subjective and unilateral intent cannot control, and that in the absence of a formal declaration of a dividend by Red Ball's board, appellees were required to show concurring intention on the part of Red Ball in order to overcome the legal implication of an obligation to repay from the fact of the withdrawals and the book entries showing that they were treated as loans rather than as dividends.

We have difficulty in applying the concept of subjective intention to a corporation, which acts only by its board of directors and by its officers and agents within authority granted by the board. We are not sure that the intention of any of these individuals can be considered the intention of the corporation in the absence of any contemporaneous resolution, contract or authorized statement. The sounder approach is to determine in the light of the undisputed facts whether the advances were dividends within the terms of the security agreement as a matter of law. We hold that they were dividends as a matter of law, as appellants contend in their second and third points. The only possible fact issue is Ramo's intention, and that issue, if controlling, has been resolved in appellants' favor by the jury's finding, which we have held to be based on sufficient evidence.

We hold the advances to be dividends because of our interpretation of the dividend limitation. The obvious purpose of that provision was to maintain the financial strength of Red Ball so that in the event of default by Ramo the noteholders would be assured of collecting the balance of their notes by a trustee's sale of Red Ball's stock, which was pledged as security. The maintenance of Red Ball's financial strength depended in part on availability of working

capital, which was assured at the time of the sale by a surplus of more than $2,-250,000, much of which was in cash. Depletion of this surplus by dividends was forbidden by Section 7(e), which specifically prohibited any dividend that would reduce the capital and surplus of Red Ball and its subsidiaries below the aggregate capital and surplus as of March 31, 1968.

Instead of maintaining this surplus as working capital, Ramo immediately withdrew $1,500,000 for its own purposes and later caused Red Ball to pay out additional sums for Ramo's benefit, bringing the total to $2,272,375. Red Ball's need for these funds as working capital is shown by its borrowings from National Bank of Commerce of $200,000, from Bossier Bank & Trust Company of $250,000, and from TeleCom of $1,425,000, at interest running from 8½ to 9½ per cent. The surplus had come from profits earned under the English management, but after Ramo took over, Red Ball operated at a loss. It is reasonable to suppose that the high interest which Red Ball had to pay because of Ramo's withdrawals was a substantial factor in these losses. Thus it is clear that the advances to Ramo resulted in precisely the type of financial weakness which the dividend limitation was designed to prevent.

Ramo's use of Red Ball's funds without interest was a substantial detriment to Red Ball and a benefit to Ramo in the nature of a dividend, at least to the extent of the interest, since even if the advances are treated as loans, Ramo had the benefit of the interest on Red Ball's money. Such use was equivalent to Red Ball's payment of interest on Ramo's debt, which would have been a dividend. Bell Bakeries v. Jefferson Standard Life Ins. Co., 245 N.C. 408, 96 S.E.2d 408 (1957).

■ Appellees insist that these advances were loans and that the security agreement contains no covenant against inter-company loans. It may be conceded that a bona fide loan from Red Ball to Ramo, evidenced by a note providing a definite maturity date at a reasonable rate of interest and secured in such manner as sound business judgment would require, would not be a "dividend" within Section 7(e). These advances were not of that sort. Lord testified that the advances were not owed to "outside interests," and he speaks of Red Ball, Ramo and TeleCom as "all one company." Evidently he treated them so and ignored the fact that Red Ball's stock was not Ramo's absolute property, but was pledged to secure notes held by appellees. We are unwilling to permit the dividend limitation to be circumvented by so transparent a device as entering the withdrawals on the books as "accounts receivable" and calling them loans. We hold that regardless of the form of the transaction, a distribution of corporate funds to a controlling stockholder because of its stock ownership and for its sole benefit, and repayable at its sole discretion, is a dividend in so far as the rights of creditors are concerned. Therefore, we hold as a matter of law that these advancements were "dividends" within the meaning of the security agreement.

This holding is supported by various authorities. The issue of whether advances to stockholders of closed corporations are dividends rather than loans has arisen most often in federal income tax cases. The federal decisions unanimously hold such advances to be taxable as dividends if the circumstances indicate an intention of the stockholder not to repay. Spheeris v. Commissioner of Internal Revenue, 284 F.2d 928 (7th Cir. 1960), cert. denied 366 U.S. 944, 81 S.Ct. 1673, 6 L.Ed.2d 855; Oyster Shell Products Corp. v. C. I. R., 313 F.2d 449 (2d Cir. 1963). In Ogden Company v. C. I. R., 412 F.2d 223 (5th Cir. 1969), this rule was applied to advances to a parent corporation by its wholly-owned subsidiary. The tax authorities give controlling weight to a finding of the stockholders' intention not to repay, and if followed strictly here would require rendition of judgment on the basis of the jury's finding to Special Issue No. 18.

Appellees attempt to distinguish the tax cases on the ground that they only establish a rule of accounting to avoid evasion of the tax laws and do not adjudicate the legal obligations between the parties. We find them persuasive because the interest of a pledgee of the stock of a closed corporation under a security agreement with a dividend limitation, like that of the government in a tax case, is to determine whether the stockholder is actually enjoying beneficial distributions of corporate profits advanced in the form of loans, and thus attempting to evade the consequences of distributing the same funds as dividends.

Authorities in other comparable situations hold that informal withdrawals of corporate funds by controlling stockholders amount to dividends. For instance, in Central of Georgia Ry Co. v. Central Trust Co., 135 Ga. 472, 69 S.E. 708, 719 (1910), a railroad company's complete control over a subsidiary was held to require treatment of funds deposited with it by the subsidiary as dividend income available for interest payments to the railroad's bondholders. Also in Smith v. Moore, 199 F. 689 (9th Cir. 1912), withdrawals by a principal stockholder, carried on the corporate books as debit items, were found to be dividends for which the stockholders' representative had to account to a party whose stock was obtained by fraud. Other informal withdrawals by controlling stockholders have been recognized as dividends imposing no liability for repayment to the corporation or subsequent creditors. Oilwell Chemical & Materials Co. v. Petroleum Supply Co., 64 Cal.App.2d 367, 148 P.2d 720 (1944); Metropolitan Trust Company v. Becklenberg, 300 Ill.App. 453, 21 N.E.2d 152 (1939); E.M.T. Coal Co. v. Rogers, 216 Ky. 440, 288 S.W. 342 (1926); In re Wilson's Estate, 85 Ore. 604, 167 P. 580 (1917). Appellees have cited no cases and we have found none holding comparable advances to be loans rather than dividends.

c. *Evidence in Bill of Exceptions.*

Appellees urge us to interpret the dividend limitation in the light of evidence ex-cluded by the trial court and presented here in a bill of exceptions. This evidence would show that before the sale appellants H. E. English and O. B. English had received similar advancements in large amounts, which they paid back at the time of the sale, and that in the course of negotiations for the sale, the sellers' representative proposed a provision forbidding inter-company loans, which was rejected by the buyers' agent. Appellees do not ask us to reverse and remand so that this evidence may be presented to a jury at a new trial. Rather, they insist that it is admissible to assist the court in construing the dividend limitation by showing the circumstances under which the contract was made. They argue that such construction is not a question of fact, but solely a question of law, and that we can consider the excluded testimony here in determining such a question.

We cannot consider the excluded evidence even on a question of law. The only decisions cited to the effect that evidence in a bill of exceptions can be considered on appeal involved the question whether the case should be remanded for a new trial because of an error shown in the bill. Robinson v. Crump, 427 S.W.2d 861 (Tex.Sup.1968); Schaffner v. Consolidated Oil Co., 293 S.W. 159 (Tex.Comm'n App. 1927); Gray v. Mills, 206 S.W.2d 278 (Tex. Civ.App., Fort Worth 1947), affirmed 147 Tex. 33, 210 S.W.2d 985. We have found no cases holding that a judgment may be affirmed, or reversed and a different judgment rendered, on the basis of evidence excluded at the trial. Litigants are entitled to rely on the trial court's rulings as determining the record on which judgment is to be rendered. If the trial court had admitted the evidence concerning circumstances leading up to the signing, appellants would have been entitled to rebut by offering testimony of other circumstances. Since it was excluded, they could forego rebutting evidence and limit their cross-examination to that necessary to qualify the bill. If that exclusion was erroneous, appellees'

only remedy was to assign such ruling as error on their own appeal and pray for a remand on that ground. Since they have not done so, we do not have before us the question of whether the evidence was erroneously excluded, and we cannot consider it for any other purpose.

This holding is supported in principle by First Nat. Bank of Wichita Falls v. Fite, 131 Tex. 523, 115 S.W.2d 1105 (1938), in which the Supreme Court held that evidence admitted as to one party but not as to another could not be used on appeal as a basis for rendering judgment against the party as to whom it was excluded. See also Anderson v. Hutto, 126 S.W.2d 709 (Tex. Civ.App., El Paso 1939, writ ref'd).

Our holding that the advances breached the dividend limitation requires reversal of the judgment denying acceleration of the notes. We turn now to the trial court's allowance of an offset of $787,500 for reduction in value of the Red Ball stock because of appellants' breach of express warranty.

2. *Appellees' Claim of Breach of Warranty Concerning Operating Rights.*

a. *Expert Testimony on Value of Stock.*

■ Appellants complain of the testimony of appellees' valuation expert, John Vaughan, on the ground that his opinion of the market value of the Red Ball stock was not based on actual appraisal of the assets of the corporation, but merely on an assumption that the purchase price of $15,-500,000 was the fair market value if the warranties in question had not been breached. We hold that the purchase price could properly be used as a basis for valuation.

Among the "Representations, Warranties, Covenants and Agreements" signed by appellants on selling the Red Ball stock was a warranty to the effect that the routes used by Red Ball's trucks were covered by certificates of authority and that no other certificates were necessary to enable Red Ball to continue to engage in the business in which it was engaged at the time of the sale. Appellees claim breaches of this warranty in two particulars, one with respect to operations between Houston and New Orleans, and the other with respect to operations between Memphis and New Orleans.

Between Houston and New Orleans, Red Ball had no authority to operate directly at the time of the sale, but did have authority to operate between Houston and Shreveport and between Shreveport and New Orleans. Red Ball's drivers had not been going by way of Shreveport, but had been regularly taking a short cut through Leesville, Louisiana, over roads not covered by any certificate held by Red Ball, thus saving about 113 miles on each trip. Between Memphis and New Orleans, appellees alleged that Red Ball was operating over a part of the route in violation of a restriction against such use in the certificate of authority granted by the Interstate Commerce Commission. Appellees offered evidence to show that discontinuance of the unauthorized routes and hauling the same freight over the longer authorized routes would have caused increased operating expenses of $313,339 per year, and that consideration of the prospect of these increased expenses would have substantially reduced the value of the Red Ball stock at the time of the sale.

Appellees' witness Vaughan was qualified as an appraiser of the stock of closely-held corporations. He testified that because of these increased expenses the actual value of the stock at the time of the sale was $3,100,000 less than the $15,500,000 it would have been worth, if the facts represented in the warranty had been true, that is, if the two disputed routes had been within the authority of the certificates held by Red Ball.

Appellants contend that Vaughan's testimony was erroneously admitted because it was not based on the concept of "fair market value," since Vaughan made no determination of actual market value but assumed the purchase price of $15,500,000 to be the fair market value and computed the

difference in value based on that figure and the estimated increase in operating costs. We do not interpret his testimony as merely assuming that $15,500,000 was the market value. He testified that the most widely-recognized factor in measuring market value of stock was a bona fide market transaction, and since the stock had actually sold for that figure, he concluded that this amount could be accepted as the market value at that time. We understand his expert opinion to be that the sale itself was evidence of the market value of the stock if the warranted facts had been true, and he accepted it on that basis.

We do not agree with appellants' argument that the only method of proving market value of the stock in a closely-held corporation under these circumstances is by a detailed appraisal of all its assets. Such an appraisal of a multimillion-dollar enterprise like Red Ball, truck by truck, and terminal by terminal, with all its prospects and risks, is a difficult and expensive procedure, involving many different estimates of value, and the result would be no more reliable than the actual figure which the parties reached here for an arms'-length trade. Since appellants sold the stock for $15,500,000 with a warranty that certain facts were true, and appellees now allege that those facts were not true, we do not think appellants should be heard to say that this selling price cannot be taken as evidence of what the stock would have been worth if those facts were true. Neither do we think that the purchaser should be required to obtain a complete appraisal of the assets of the business in order to establish its damages for breach of warranty in one or two respects. Such a requirement might be so onerous as to preclude any practical remedy for an established breach. Since the evidence shows that the selling price was determined by arms'-length negotiations between experienced and well-informed business men, we hold that the figure so agreed upon could be properly used as the basis for expert testimony concerning market value. Denman v. Stuart, 142 Tex. 129, 176 S.W.2d 730 (1944); White

v. Street, 67 Tex. 177, 2 S.W. 529 (1886); Doyle v. Union Bank & Trust Co., 102 Mont. 563, 59 P.2d 1171, 108 A.L.R. 1047 (1936); Ford v. H. W. Dubiske Co., 105 Conn. 572, 136 A. 560 (1927); Meyers v. Acme Iron Co., 103 Kan. 362, 175 P. 162 (1918).

None of the authorities cited by appellants support their contention that the purchase price cannot be taken as some evidence of market value in a situation like this. In Morriss-Buick Co. v. Pondrom, 131 Tex. 98, 113 S.W.2d 889 (1938), the Supreme Court held that the amount allowed as a trade-in for an old car was not conclusive evidence of its value, since it was common knowledge that such allowances were made as a result of negotiations concerning the difference to be paid for the new car, but the court was careful to limit its opinion by saying, "There might exist a state of facts, where it would be proper to assume the agreed value to be the actual cash market value." In White v. Bond, 362 S.W.2d 295 (Tex.Sup.1962), a suit for damages for fraud in the sale of stock in a proposed uranium-mining corporation, recovery was denied on the ground that the record was "wholly silent as to what value the stock would have had if the representations had been true." Apparently no contention was made that the price paid for the stock was evidence of the value it would have had if the representations had been true, and the decision seems to rest on the ground that representations that the stock was "good stock" and that the purchasers "were being let in on the 'ground floor'" were too vague and indefinite and could not form the basis for any proof as to the value of the stock as represented. Certainly the court did not hold that a purchase price determined after careful investigation and negotiation, like that here, is no evidence of market value.

b. *Subsequent Authority for the Houston-New Orleans Route.*

Appellants complain also of an oral instruction of the trial court limiting the ef-

fect of evidence concerning Red Ball's application for authority to operate directly between Houston and New Orleans over Interstate Highway 10 and the trial court's failure to grant a new trial because of "newly-discovered evidence" that such authority had been granted after the trial was over. We overrule these contentions.

The court admitted oral testimony showing that Red Ball made application for authority to operate over this direct route in 1965, and an amended application in 1966, which was pending at the time of the sale in June, 1968, that this application was later heard before a joint Texas-Louisiana board, which recommended the granting of the authority, and that on April 1, 1970, the Interstate Commerce Commission entered an order affirming such recommendation, but that a motion for reconsideration by a competing carrier was pending at the time of trial. Copies of the application, the amendment, supporting brief, report of the joint board, and the commission's order of April 1, 1970, were admitted in evidence, but after admitting these exhibits, the court gave the following instruction: "I am going to instruct the jury that they may not be considered for the purpose of determining the value of Red Ball stock on June 21 or June 22, the date of the transaction or immediately thereafter."

██ Appellants contend that these exhibits should have been admitted for all purposes because they established that no damages in fact resulted from lack of authority for the Houston-New Orleans route. We find no error in the trial court's instruction limiting the jury's consideration of these exhibits. The issue was not the actual increase in Red Ball's expenses because of operating over a route between Houston and New Orleans longer than the Leesville short cut, but the difference in the market value of its stock on the day of sale because such lack of authority indicated a prospective increase in operating expenses. Offsetting this prospect was the probability on the day of sale of additional authority being granted later on the pending application for direct service over Interstate Highway 10, about which the jury was fully informed. Developments after the sale were not relevant to the issue on market value on the date of the sale, whether they enhanced or reduced such value, unless they bore on the prospects which the parties may have considered at the time of the sale.

The situation is analogous to a change in zoning affecting market value of land taken by eminent domain. In City of Austin v. Cannizzo, 153 Tex. 324, 267 S.W.2d 808 (1954), our Supreme Court held that evidence tending to show a reasonable probability of a zoning change after the taking was admissible on the issue of value at the time of taking. In State by State Highway Commissioner v. Gorga, 26 N.J. 113, 138 A.2d 833 (1958), the Supreme Court of New Jersey held that proof of an actual change of zoning after the taking was admissible on the probability of rezoning at the time of taking, but should be carefully limited so that the value on the date of taking would be determined on the basis of facts as they then would have appeared to the hypothetical buyer and seller. Also, the Court of Appeals of Maryland held in Reindollar v. Kaiser, 195 Md. 314, 73 A.2d 493 (1950), that in view of evidence before the jury of zoning laws which went into effect after the taking, the trial court properly instructed the jury that the property could have been utilized or sold for any purpose at the time of the taking because no zoning laws were then in force.

Similar questions have occasionally arisen in fraud cases. Thus in McDonnell-Perkins Builders, Inc. v. Cranford, 328 S.W.2d 800 (Tex.Civ.App., Fort Worth 1959, writ ref'd n. r. e.), which involved a representation that a house sold was not in a flood area, testimony concerning value of the property more than two months later, after a flood had occurred, was held insufficient to support submission of an issue as to value at the time of the sale. Also, in Westwood Development Co. v. Esponge, 342 S.W.2d 623 (Tex.Civ.App.,

San Antonio 1961, writ ref'd n. r. e.), which involved concealment of a sanitary fill on lots sold, the judgment was reversed because it was based on the difference between the market value of the lots at the time of the sale and the value after discovery of the fill rather than the difference in actual and represented value at the time of the sale, but evidence of the condition of the property at time of trial was held admissible on its condition at the time of the sale. In Forshagen v. Payne, 225 S.W.2d 229 (Tex.Civ.App., Fort Worth 1949, no writ), a dry well on property sold was represented as productive and a new trial was ordered because of newly-discovered evidence that after the trial plaintiff sold the property for as much as he had paid for it.

In cases involving fraud in sale of corporate securities, the general rule is that actual value must be determined as of the time of the sale rather than after financial reverses occur. Doyle v. Union Bank & Trust Co., 102 Mont. 563, 59 P.2d 1171, 108 A.L.R. 1047 (1936). However, in extraordinary cases evidence of subsequent events has been admitted. For example, where the market value of the stock at the time of the sale was influenced by the fraud, and was therefore illusory, the entire history of the company, including subsequent events, has been admitted to show the intrinsic value at the time of the sale. Hindman v. First Nat. Bank, 112 F. 931, 57 L.R.A. 108 (6th Cir. 1902, cert. den. 186 U.S. 483, 22 S.Ct. 943, 46 L.Ed. 1261); Whiting v. Price, 172 Mass. 240, 51 N.E. 1084, 70 Am.St.Rep. 262 (1898); Peek v. Derry, 37 Ch.Div. 541 (Eng.1887), reversed on other grounds in Derry v. Peek, 14 App. Cas. 337. Also, where the security is bought for an investment, and the fraud influences the purchaser to keep holding the security, full relief may require determination of the value at the time of discovery of the fraud. Hotaling v. Leach & Co., 247 N.Y. 84, 159 N.E. 870, 57 A.L.R. 1136 (1928).

■ From these authorities we conclude that evidence of subsequent events is admissible on the issue of value of property at a certain time if it has a logical bearing on conditions at that time, but it may have such a tendency to confuse the jury about the time and manner of the valuation that it should be accompanied by an instruction explaining the limited purpose of its admission. Here the evidence of subsequent proceedings to obtain additional operating authority between Houston and New Orleans was of that character, but appellants made no offer of the evidence for a limited purpose and no request for a limiting instruction. On the contrary, appellants argued to the court, and presumably would have argued to the jury if the exhibits had been admitted without qualification, that these subsequent proceedings showed that no damages were sustained. In this situation we find no error in the instruction that these exhibits should not be considered for the purpose of determining the market value of the stock at the time of the sale.

■ This conclusion is supported by authorities holding that exclusion of evidence is not error, even though it is admissible for limited purpose, if the offer is not limited to that purpose, but is made for all purposes, or for a purpose for which the evidence is not admissible. Singleton v. Carmichael, 305 S.W.2d 379 (Tex.Civ.App., Houston 1957, writ ref'd n. r. e.); Luvual v. Henke & Pillot, 366 S.W.2d 831 (Tex. Civ.App., Houston 1963, writ ref'd n. r. e.); 1 Wigmore on Evidence, § 17 at 320 (3d Ed.1940); 1 McCormick & Ray, Texas Law of Evidence, § 21 at 19 (2d Ed.1956). See also Kainer v. Walker, 377 S.W.2d 613 (Tex.Sup.1964), in which the Supreme Court observed that evidence of a personal injury claimant's income from a collateral source was not offered in the trial court on the issue of whether he would have chosen to retire even if he had not been injured, and could not be admitted on any such theory "unless the tender is properly limited and the jury is instructed accordingly."

■ Likewise, the commission's final order issued after the trial, and more than two years after the sale, granting authority for use of the direct Houston-New Orleans route, was not such newly-discovered evidence as to require a new trial. That order was not admissible generally to show that no damages were sustained, and at best would have been admissible only for the limited purpose of showing the probability at the time of sale of obtaining additional authority. If admissible for that purpose, it was cumulative of evidence already before the jury. State by State Highway Commissioner v. Speare, 86 N.J.Super. 565, 207 A.2d 552 (1965).

We have examined all of appellants' remaining points and also appellees' cross-points and overrule them for reasons stated in a supplemental opinion filed along with this opinion. Under Tex.Rules Civ. Proc. 452, we order the supplemental opinion not published, since it is confined to interpretation of the particular language of this security agreement, sufficiency of evidence, and other matters which present no question of interest or importance to the jurisprudence of the state.

The judgment below is reversed and the cause is remanded to the district court with instructions to render judgment on the notes for acceleration of the outstanding balance, interest, attorneys' fees, and foreclosure of the lien on the Red Ball stock, less the amount of the offset for breach of warranty as found by the jury.

## ON MOTIONS FOR REHEARING

■ On consideration of appellees' original motion for rehearing, we sustained their contention that we should remand the cause to the trial court so that they might plead and prove grounds for equitable relief against appellants' claim for acceleration and foreclosure. Appellants have filed a second motion for rehearing insisting that under City of Fort Worth v. Pippen, 439 S.W.2d 660 (Tex.Sup.1969), we have no authority to remand for this purpose. After a careful study of that opinion we must agree. Consequently, we withdraw our opinion on the first motion for rehearing and reinstate our original judgment.

Under the *Pippen* decision, appellees' claim for equitable relief on motion for rehearing in this court comes too late. In that case the city sued its agent for conversion of funds and joined a title company and its vice-president on the grounds that they paid money to the agent with knowledge of his conversions. The jury found for the city, but the trial court rendered judgment for the defendants notwithstanding the verdict. On appeal defendants contended that the city had failed to discharge its burden to prove that the money was converted, since the evidence showed that some of the funds paid to the agent were used for the city's benefit. The court of civil appeals reversed and rendered judgment on the verdict on the ground that such benefits were matters of offset which defendants had the burden to plead and prove. On rehearing, the court of civil appeals remanded for a limited new trial "in the interest of justice" so that defendants could amend their pleadings and prove the amount of the offsets. City of Fort Worth v. Pippen, 430 S.W.2d 239 (Tex.Civ.App., Fort Worth 1968). The Supreme Court agreed with the law as declared by the court of civil appeals, but reversed the order of remand on the ground that defendants waived their claim of offsets by failing to present it in the trial court. 439 S.W.2d 660, at 667.

We find no basis on which to distinguish the *Pippen* case. Here, as there, appellees failed to allege in the trial court the grounds upon which they now desire to obtain relief on a new trial. Appellees began this suit by an action for declaratory judgment, and appellants counterclaimed for acceleration and foreclosure. Appellees' trial pleading was an amended original petition in which their only reference to advances from Red Ball was an allegation that Ramo was entitled to such advances

without limitation. Though they now charge appellants with inequitable conduct in breaching warranties and in giving notice of default on grounds now found to be unjustified, they did not plead or prove that such conduct caused breach of the dividend limitation or kept appellees from remedying the default after they received the notice of March 16, 1970. Neither did they plead or prove that any attempted cure would have been futile. They did not ask the trial court, even alternatively, to fix the amount they should pay back to Red Ball, nor did they offer to pay Red Ball any amount in addition to the $1,400,000 which was used to pay a debt to TeleCom. They did not suggest until their motion for rehearing in this court that appellants' breach of warranty, which entitled appellees to an offset to the notes, should be considered in determining whether they were in default in failing to cure their breach of the dividend limitation.

Like the *Pippen* case, this trial continued for six weeks and none of the parties were denied any opportunity to present any pleadings or evidence they desired, and after verdict appellees persuaded the trial court to enter a judgment which we now find to be erroneous. The trial court's ruling cannot be said to have prevented appellees in any respect from pleading and proving grounds of equitable relief. They failed to present those grounds either in the trial court or in this court until judgment in their favor had been reversed. Under *Pippen* we cannot now "fashion a remedy" to relieve them of the consequences of their default.

■ Neither can we justify a remand on the ground that the relief appellees are seeking is equitable rather than legal. The *Pippen* case was equitable in nature, according to the opinion of the court of civil appeals. 430 S.W.2d 239, at 244. Appellees cite no authority holding that equitable relief may be granted without pleading the grounds on which such relief is sought. Gause v. Gause, 430 S.W.2d 409 (Tex.Civ. App., Austin 1968, no writ), holds that a prayer for general relief will authorize any judgment justified by allegations and proof and consistent with the theory of recovery stated in the pleadings, but does not hold that such a prayer cures a lack of factual allegations. *Gause* also holds that the equitable defense of laches must be affirmatively pleaded, on authority of Gulf, C. & S. F. Ry. Co. v. McBride, 159 Tex. 442, 322 S.W.2d 492 (1958) and Culver v. Pickens, 142 Tex. 87, 176 S.W.2d 167 (1943). We see no basis for applying a different rule to the equitable defense now claimed by appellees.

■ The ancient distinction between law and equity cannot control our decision as to whether to render or remand. In both law and equity our duty is defined by Tex.R.Civ.P. 434, which requires us to render the judgment which the trial court should have rendered unless there is some matter of fact to be ascertained, and appellees do not contend that their claim for equitable relief would involve determination of any fact issues. When a judgment notwithstanding the verdict is reversed, and no other error is found, remand is proper only in unusual cases and only for good and sufficient reasons shown in the record. Jackson v. Ewton, 411 S.W.2d 715 (Tex. Sup.1967). Since in *Pippen* the Supreme Court did not regard defendants' claim of offsets as good and sufficient reason for a remand because it had not been presented in the trial court, neither can we hold here that appellees' belated claim for equitable relief against acceleration justifies a new trial.

We now turn to other matters raised by appellees in their first and second motions for rehearing. In their first motion they challenge the statement in our original opinion that the only formalities evidencing the advances to Ramo were entries on the books of the two corporations. They direct our attention for the first time to a resolution of Red Ball's board of directors dated June 21, 1968, authorizing a loan to Ramo in the amount of $1,500,000 "on an

open account payable on demand." This resolution does not change the situation in substance, and neither does it change our opinion that the advances were forbidden dividends under the undisputed evidence, regardless of the form of the transaction.

Appellees also argue that the advances should not be considered as breaches of the dividend limitation because appellants knew about the advances when they were made and did not object until their letter of March 16, 1970, almost two years later. Appellees make no supporting reference to any evidence properly before us. Neither do they point to any pleading of waiver or estoppel. Consequently, we have no basis to hold that appellants had knowledge of the advances under such circumstances as would bar them from contending that the advances are prohibited dividends.

■ Appellees seek clarification of our original order in several respects. One such matter concerns interest on the offset of $787,500, which the trial court allowed at the rate of 6 per cent per annum. In this connection appellants' Points 99, 100 and 101 assign error with respect to application of the offset and the rate of interest. We sustain these points. The offset should not be a separate judgment bearing interest. It should be applied proportionately to reduce the principal of all the outstanding notes. The reduced principal should bear interest at the contract rate, and if any interest payments have been greater than would have been required in view of this reduction of the principal on which the interest has been computed, such excess should be credited as advance payments of principal.

Appellants' Points 102 and 103, complaining of the provisions of the judgment for charges payable to the trustee, Mercantile National Bank, are also sustained, and no such charges should be included in the judgment to be rendered unless established by evidence and allowed by the court.

■ The amount of attorneys' fees to be awarded is a matter for the trial court to determine in accordance with the instructions in our original opinion, and in this connection we note the stipulation and agreement of appellants' counsel that the attorneys' fees be limited to 10 per cent of the amount of principal and interest on the notes at the time they were placed in the hands of the attorneys for collection. The amount of principal should be determined after allowing the offset of $787,-500. We overrule appellees' contention that appellants are entitled to no attorneys' fees at all. Section 6 of the security agreement clearly provides for attorneys' fees if collection of the notes is enforced by suit.

Appellees insist on the right to avoid foreclosure by paying the judgment, and nothing in our original or supplemental opinion should be interpreted as denying that right.

■ Appellees attack the verdict for improper communication with the jury. Though this matter is raised for the first time on motion for rehearing, appellees say they did not discover it until after submission of the appeal. Appellants deny any impropriety, and we have no jurisdiction to resolve the factual dispute. The verdict is not material to our decision on the dividend limitation, since we have held the advances to be dividends as a matter of law. Appellees point out, however, that the verdict was unfavorable to them on several issues material to their claims for breach of warranty. After the trial court renders final judgment as now instructed, appellants may file a motion for new trial on this ground. See De Winne v. Allen, 154 Tex. 316, 277 S.W.2d 95 (1955); Arrington v. Paschall, 352 S.W.2d 866 (Tex. Civ.App., Dallas 1961, writ ref'd n. r. e.); Bardwell v. Anderson, 325 S.W.2d 929 (Tex.Civ.App., Houston 1959, writ ref'd n. r. e.).

Appellants' second motion for rehearing is granted to the extent that it complains

of the change in our judgment on the original motion for rehearing. Accordingly, we withdraw our former opinion on rehearing and reaffirm our original and supplemental opinions. Otherwise, all motions for rehearing are overruled.