# In re W.T. MAYFIELD SONS TRUCKING CO., INC., Debtor.

**Bankruptcy No. 96–63194.**

United States Bankruptcy Court, N.D. Georgia, Atlanta Division.

Sept. 30, 1998.

Guy G. Gebhardt, James H. Morawetz, Office of United States Trustee, Atlanta, Georgia, for U.S. Trustee.

Albert N. Remler, Remler Law Group, P.C., Atlanta, Georgia, for Debtor.

## ORDER GRANTING MOTION OF UNITED STATES TRUSTEE FOR DISGORGEMENT OF FEES

JAMES E. MASSEY, Bankruptcy Judge.

Eric B. Reuss was the attorney in this case for W.T. Mayfield Sons Trucking Co., Inc. in its capacity as a Chapter 11 debtor in possession, though the Debtor never asked the court to approve the professional relationship, as required by § 327 of the Bankruptcy Code. Nor did Mr. Reuss ever apply for compensation from the estate, which would have also involved judicial review, under § 330. Mr. Reuss did receive compensation, however, but not from officers of the Debtor, the source he identified in an amended statement filed pursuant to Bankruptcy Rule 2016(b).

Without revealing the arrangement to the court or creditors, Mr. Reuss through two professional corporations billed and accepted payments totaling more than $90,000 from Mayfield Rigging Co., Inc., a wholly owned, solvent subsidiary of the Debtor.

The U.S. Trustee moves for an order requiring disgorgement of the payments made by Mayfield Rigging to Mr. Reuss and his professional corporations. He grounds the motion on the absence of court approval either of Mr. Reuss' employment as Debtor's counsel or of the compensation paid, the unreasonableness of the compensation paid and the filing of false Rule 2016(b) disclosure statements. In response, Mr. Reuss contends that the Debtor had no interest in the funds used to pay his fees. He concedes that the court may review fee arrangements between a debtor's attorney and a third party but asserts that the only issue presented is whether the compensation paid was excessive. Among the issues raised here is a novel one: whether secret payments by a wholly owned and solvent subsidiary of a Chapter 11 debtor to the debtor's counsel for professional services rendered to the debtor in its capacity as debtor in possession constitute property of the estate under § 541(a) of the Bankruptcy Code. The court held an evidentiary hearing on the motion, and the parties briefed their positions.

As its name states, W.T. Mayfield Sons Trucking Co., Inc. was in the trucking business. It was a specialty hauler, transporting very large cargo over irregular routes. At the time of its bankruptcy on February 29, 1996, the company valued its assets at $5,000,000 and acknowledged liabilities of about $6,000,000. Its tax liability led to bankruptcy. The Internal Revenue Service threatened to shut down the company in an effort to collect unpaid withholding taxes totaling more than $600,000. It also asserted claims against several of the Debtor's officers. To deal with its problems with the I.R.S., Mayfield Trucking turned to Eric Reuss on the recommendation of its outside accountant. Mr. Reuss negotiated with an I.R.S. agent but was unable to reach an agreement. The company then sought to retain Mr. Reuss to file a bankruptcy petition.

In a letter dated February 26, 1996, addressed to Mr. Jim Mayfield, W.T. Mayfield Sons Trucking Co., Inc., Reuss stated in part:

This will follow up our conversations today. I wanted you to know exactly what your legal cost parameters would be to file a Chapter 11. The following is what you

would have to come up with prior to the work commencing:

| | |
|---|---:|
| Chapter 11 Filing Fee | $ 800.00 |
| Non-refundable retainer | 15,000.00 |
| Current balance (see statement) | 666.75 |
| Total | $16,466.75 |

The funds would of course have to be in the form of a cashier's check, certified check, or cash, due to the procedure of shutting down your accounts upon filing.

This letter set the stage for what followed. Mr. Reuss revealed that he was unwilling to risk nonpayment, so much so that he demanded preferential payment of a debt for $666.75, in addition to a cash retainer of $15,000. He advised Mr. Mayfield that once the petition was filed, the rules about paying lawyers and prepetition debt would change, thereby sending the subtle message that paying lawyers postpetition was a problem, which might impede relief from the effort of the I.R.S. to collect. There is no evidence that he informed the Debtor that it could pay professionals postpetition from unencumbered assets if the court approved the employment and the compensation.

The Debtor apparently did not have the cash to pay the retainer demanded by Mr. Reuss. So two days later, the principals of Mayfield Trucking, James J. Mayfield, Sr., and James J. Mayfield, Jr., executed a note dated February 28, 1996, to Eric B. Reuss, P.C. in the amount of $14,000 for "value received" as an initial retainer. That fee arrangement was short-lived when Mr. Reuss realized that this was a major piece of legal work. He testified, "just before, at the time of the bankruptcy filing when the level of work—when it became apparent that this was going to be much more involved than was originally anticipated, Jim and I worked out an arrangement where there would be a fee basically paid of sixty thousand dollars. That was—there was an additional promissory note signed by Jim Mayfield to bring the total amount that I had in the form of promissory notes up to sixty thousand dollars at or before the time of the bankruptcy filing." Hearing Tr. 7–8.

That fee arrangement also had a short life. The Mayfields quickly changed their minds and told Mr. Reuss that they did not want to be personally responsible for paying his legal fees. According to Reuss, Jim Mayfield, Jr. asked whether he would agree to bill the Debtor's subsidiary, Mayfield Rigging, instead of relying on the Mayfields personally. The general manager and later president of Mayfield Rigging, James T. Pirkle, had a different recollection. On examination by Reuss' lawyer, he testified credibly that Mayfield, Sr., now deceased, told him that it was Reuss, not the Mayfields, who had suggested billing the subsidiary. Reuss' counsel made no motion to strike this hearsay testimony. Neither the U.S. Trustee nor Mr. Reuss called Jim Mayfield, Jr. as a witness.

Regardless of the origin of the idea, Mr. Reuss approved the fee arrangement with Mayfield Rigging, which cut a check dated February 29, 1996 for $2,500 payable to Eric B. Reuss, P.C. The check cleared the following day. He acknowledges that the $14,000 note "as well as remaining individual offers to pay were withdrawn prior to the filing for relief under Chapter 11 of the Bankruptcy Code on February 29, 1996." Reuss Reply Brief, 2.

On February 29, 1996, Mr. Reuss filed a Chapter 11 bankruptcy petition for Mayfield Trucking, showing Eric B. Reuss, P.C. as the Debtor's attorney. Until a trustee was appointed in the Chapter 11 case in December 1997, Mr. Reuss acted as counsel for the Debtor. He appeared regularly in court and prepared and filed numerous pleadings for the Debtor, which he signed as its counsel.

Among the first of those pleadings, filed on March 15, 1996, was the Debtor's Statement of Financial Affairs. Item 9 directs a debtor to

[l]ist all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy within one year immediately preceding the commencement of this case.

In response, a box labeled "none" adjacent to item 9 was checked.

In the same filing package, Mr. Reuss included his disclosure statement con-

cerning his fee arrangement, which is required by § 329(a) and Bankruptcy Rule 2016(b). An attorney representing a debtor in a bankruptcy case or in connection with a bankruptcy case must file with the court a statement disclosing the amount and source of compensation paid or promised from and after one year prior to the petition date, whether or not the attorney applies for compensation in the bankruptcy case. 11 U.S.C. § 329(a). The initial disclosure statement is due within 15 days of the entry of the order for relief and must be supplemented within 15 days after any payment or agreement not previously disclosed. Fed.R.Bankr.P. 2016(b).

In that statement, Mr. Reuss identified his firm as Reuss Legal Services, P.C., rather than Eric B. Reuss, P.C., the firm name stated on the petition. He stated that he had received no funds from the Debtor, other than $800 for the filing fee, and that his fee arrangement was "To be det." which he testified meant "to be determined." He also stated that he had received "no transfer, assignment or pledge of property ... for the value stated."

On October 6, 1997, Mr. Reuss filed a pleading entitled "Amendment of Statement of Financial Affairs and Statement pursuant to Rule 2016(b)." Although that pleading purports to be filed by the Debtor, Mr. Reuss signed it. It states:

> Comes now the Debtor, WTMT, Inc., f/k/a W.T. Mayfield Sons Trucking Co., Inc., and amends its Statement of Financial Affairs and Statement Pursuant to Rule 2016(b) by stating the following: Within the one year immediately preceding the commencement of this case, two of the Debtor's officers employed Reuss Legal Services, P.C. ("RLS") to represent the Debtor and the Debtor's officers and directors with respect to the Debtor's and the Debtor's officers and directors' liabilities to the Internal Revenue Service. Said officers paid RLS a fee of $60,000 therefor. In accepting the employment arrangement, RLS agreed to represent the Debtor in any bankruptcy proceeding that might be required and to not submit an application for payment of additional fees.

The court takes judicial notice that on March 8, 1996, Mr. Reuss filed his own Chapter 11 proceeding. That case, assigned to Judge Joyce Bihary, was not disclosed on the record here. On March 11, 1996, Mr. Reuss filed an adversary proceeding to determine the extent of his tax liability to the Internal Revenue Service. His Chapter 11 case resulted in a confirmed plan and was closed on April 4, 1997.

Beginning in mid-March 1996, Mr. Reuss sent Mayfield Rigging twenty-three statements for legal services rendered primarily to the Debtor. He used the name "Eric B. Reuss, P.C." until May 1996, when he began to bill under the name "Reuss Legal Services, P.C." Between February 29, 1996 and March 24, 1997, Mayfield Rigging paid Reuss through his professional corporations the total sum of $93,177.69.

On the motion of the United States Trustee, the court ordered the appointment of a Chapter 11 Trustee on December 10, 1997. On January 16, 1998, the court entered an order converting the case to one under Chapter 7.

█ Eric Reuss undertook to be counsel to W.T. Mayfield Sons Trucking Co., Inc. in its capacity as debtor in possession. A debtor in possession in Chapter 11 has the rights and performs most of the duties of a trustee. 11 U.S.C. § 1107. It is a fiduciary to the creditors and the court.

█ Pursuant to § 327(a), "the trustee, with the court's approval, may employ one or more attorneys, accountants ... or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title." Since Chapter 3 of title 11 applies to Chapter 11, a debtor in possession may also employ an attorney but, like a trustee, only with court approval. *Fanelli v. Hensley (In re Triangle Chemicals, Inc.)*, 697 F.2d 1280, 1284 (5th Cir.1983). That the attorney may be looking to a third party for payment is irrelevant to the obligation to obtain court approval. *Ferrara & Hantman v. Alvarez (In re Engel)*, 124 F.3d 567, 571 (3rd Cir.1997) ("Even if

compensation is to come from some source other than the estate, employment of an attorney by the debtor-in-possession must still be approved by the bankruptcy court.").

■ Failure to obtain timely court approval of employment is a sufficient basis for denying compensation, regardless of the value of services rendered. *Id.* Section 327(a) does not state an absolute deadline for obtaining approval of counsel, but waiting until after the work is complete is often fatal to a professional's application for compensation. *See, e.g., In re Singson,* 41 F.3d 316, 319 (7th Cir.1994) (lower court rulings denying compensation to unapproved counsel affirmed in the absence of a showing of excusable neglect).

[W]hen the trustee establishes "excusable neglect," the court may give retroactive authorization under § 327(a) and Rule 2014(a) for the provision of professional services.... And we know from *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), that it is possible to show "excusable neglect," as Rule 9006(b)(1) uses that term, without identifying any "extraordinary" circumstance.

*Id.* at 319.

■ Here, Mr. Reuss asserts that his failure to comply with § 327 was "unintentional." Reuss Reply Brief, 5. He testified that he had prepared an application, which, after receiving the U.S. Trustee's motion, he discovered in his files. He stated that "[a]pparently, you know, through oversight or whatever, you know, it never made it into the court's files." Hearing Tr. 11. These feeble attempts at explanation show no neglect, excusable or otherwise. Mr. Reuss remembered to file four other applications to employ professionals and he remembered to send his bills. Particularly in light of the disclosure statements he filed, the court can only conclude that instead of oversight, the "whatever" was a deliberate decision not to seek approval of his employment.

■ Section 330 of the Bankruptcy Code, dealing with compensation of officers of the estate, provides in subsection (a)(1) that the court may award compensation to "a professional person employed under section 327." It does not authorize the court to approve compensation from the estate to one not approved by the court under § 327. Because Mr. Reuss was not approved as counsel for the Debtor, even if due to inadvertence rather than design, he is not entitled to any compensation from the Debtor for serving as its counsel. *See In re Land; In re Singson; In re Triangle Chemicals, Inc.,* 697 F.2d at 1285. This principle has its origin in similar provisions of the Bankruptcy Act. *In re Eureka Upholstering Co., Inc.,* 48 F.2d 95, 95 (2d Cir.1931) (J. Hand) ("[W]ithout an order of court upon full presentation of the relation of the proposed attorney with all other interests involved, not only may he not be retained, but he can recover nothing, no matter how beneficial, or how arduous, his services.").

■ Failure to obtain approval of employment is not the only basis on which a court may disapprove professional compensation without reaching the merits of the value of the services rendered. Recall that § 327(a) permits the court to approve employment of an attorney who is a "disinterested person" as that term is defined in § 101(14) and holds no interest adverse to the estate. If it turns out that the attorney is not disinterested or holds an adverse interest, § 328(c) empowers the court to disallow all or any part of the compensation sought.

■ Mr. Reuss argued but made no evidentiary showing that he was a "disinterested person" and held no interest adverse to the estate. His argument that he was qualified to be approved as Debtor's counsel, had he only applied, is unsupportable. He held an adverse interest by secretly taking funds from a solvent subsidiary, thereby reducing the value of the Debtor's estate, to pay for services rendered to the Debtor for which the subsidiary had no obligation to pay. The February 26, 1996 letter suggests that he was a creditor on the filing date, though he contends in his brief that the prepetition debt was owed by Mayfield Rigging. Finally, he held an interest adverse to the estate in that he, too, owed taxes to the I.R.S. that he was unable to pay. Though there is not the

slightest suggestion that the I.R.S. took advantage of his dilemma in dealing with the Debtor, his own problems potentially compromised his ability to negotiate on behalf of the Debtor with the I.R.S.

Ignoring or minimizing these threshold problems, Mr. Reuss asks the court to view his conduct in light of the source of the money used to pay his fees. He correctly contends that there is no evidence in these proceedings that Mayfield Rigging is or was an alter ego of the Debtor. From that observation, he offers the apology for the scheme that because the transferred funds came from the subsidiary, they were not property of the estate within the meaning of § 541 of the Bankruptcy Code. He concludes that his fee arrangement should therefore be judged under § 329(a), dealing with review of fee arrangements with third parties, and not under §§ 327 or 330. He further argues that under § 329(a), the court's sole focus should be on the question whether the fees were reasonable, which Reuss of course maintains they were.

Mr. Reuss admits that his disclosure statements were "inapt (sic?) or incorrect" and says that his failure to file correct statements was "inadvertent." He blames "his short sightedness of being technically and factually incorrect" on "his understanding of being paid by a non-bankruptcy entity." Reuss Reply Brief, 9. But his failure to report the arrangement in his disclosure statements and his positive effort to cover up the relationship belies the notion that he believed that the arrangement was legal.

From the perspective of his contention that payments to him by the Debtor's subsidiary were not estate property, Mr. Reuss views disgorgement as a punitive measure limited to situations in which fees paid are found to be excessive. Citing *Cristopher v. Mir (In re BOH! Ristorante, Inc.)*, 99 B.R. 971 (9th Cir. BAP 1989), he argues that under § 329, disgorgement is too harsh a sanction. In that case, the Appellate Panel reversed the bankruptcy court's decision disallowing entirely fees paid to the debtor's lawyer by an individual debtor's ex-wife. It stated that total disgorgement of fees paid by a third party was an excessive sanction and

remanded the case for consideration of whether the fees paid were reasonable.

Mr. Reuss also relies on *Palmer & Palmer, P.C. v. United States Trustee (In re Hargis)*, 887 F.2d 77 (5th Cir.1989), *modified*, 895 F.2d 1025 (5th Cir.1990). In the *Hargis* case, the Fifth Circuit reversed orders of the lower courts requiring disgorgement of a payment of prepetition legal fees made by one of the debtors from her assets that were not property of the estate. Those assets were proceeds of a life insurance policy received when Mr. Hargis died following the filing of the petition. The Fifth Circuit noted that the bankruptcy judge might have blocked the lawyers from serving as debtors' counsel in the first instance. The Court reasoned, however, that the fee arrangement was not only not improper insofar as the estate was concerned, but it was very likely a benefit to creditors:

> Where, as here, payment of a claim is made out of non-estate assets, this goal is in no way served by requiring disgorgement of the payment. To the contrary, the other creditors are more likely helped than harmed, as the payment of one creditor out of non-estate assets frees up estate assets for payment of the other creditors and allows each to take a correspondingly larger slice of the bankruptcy pie.

*Hargis*, 887 F.2d at 79. In its later opinion, the Court clarified its ruling to state that the debtor's counsel was only entitled to be paid to the extent that the fees were reasonable. Mr. Reuss urges the court to extend the *Hargis* rationale to cover fees from third parties that are otherwise reasonable, even if the attorney fails to disclose the fee arrangement in a Rule 2016(b) disclosure statement.

The cases cited by Mr. Reuss are inapposite. In each case, the payment of fees had no adverse effect on the estate. The lawyers honestly disclosed the fee arrangements in statements under Bankruptcy Rule 2016. In each case, the court approved the employment of counsel by the Chapter 11 debtor. Here, by contrast, Mr. Reuss was never approved as counsel for the Debtor. Each transfer reduced the value of the stock of Mayfield Rigging and hence the overall value of the Debtor's estate. And he filed false

disclosure statements that kept the arrangement secret. Mr. Reuss is in effect arguing that he found a loophole in the Bankruptcy Code. He posits that by using the device of having a subsidiary pay a debtor's professional fees, attorneys or other professionals representing debtors can avoid routine court review of fee arrangements. As will be seen, no such loophole exists.

The linchpin of Mr. Reuss' defense is that the payments to his professional corporations were not property of the Debtor's bankruptcy estate because the money belonged to the sub. As a general rule, a corporate parent has no legal or equitable interest in the property of its subsidiary. It simply owns the stock of the sub. The question, however, is not what interest the Debtor had in the bank accounts of Mayfield Rigging but rather what interest the Debtor had in the payments once they reached Reuss' corporations. Mr. Reuss focuses on the wrong point in time. If the Debtor had an interest in the transfers as dividends, the transfers were indeed property of the estate under § 541 of the Bankruptcy Code.

The Debtor and its subsidiaries are Georgia corporations. Under the Georgia Business Corporation Code, O.C.G.A. § 14–2–101 *et seq.*, a distribution is defined as follows:

> (6) "Distribution" means a direct or indirect transfer of money or other property (except its own shares or rights to acquire its own shares) or incurrence of indebtedness by a corporation to or for the benefit of its shareholders in respect of any of its shares. A distribution may be in the form of a declaration or payment of a dividend; a purchase, redemption, or other acquisition of shares; a distribution of indebtedness; or otherwise.

O.C.G.A. § 14–2–140(6). A corporation is permitted to make distributions to its shareholders unless it "would not be able to pay its debts as they become due in the usual course of business" or its assets are less than its liabilities plus any amount needed to satisfy the claims of shareholders with superior distribution rights upon dissolution. O.C.G.A. § 14–2–640.

The definition of "distribution" in O.C.G.A. § 14–2–640 focuses on three elements. First, the corporation must make a transfer in money or property. Second, the transfer must be to or for the benefit of shareholders. Third, the transfer must be "in respect of" the shares of stock of the transferor.

The transfers to Mr. Reuss' corporations by Mayfield Rigging satisfied the first element. As to the second element, the sub did not make the transfers "to" Mayfield Trucking, but were they made for its benefit? One way to effect an indirect distribution for the benefit of a parent corporation would be to make a direct distribution to a third party to satisfy its demand for compensation for goods or services made to the parent. That is what the record here shows. That the services rendered by Reuss were for the Debtor's benefit could hardly be disputed. These were services that, Reuss made plain to the Mayfields, the Debtor would not receive without payment. Since Mayfield Rigging made the transfers to obtain the benefits of legal representation for the Debtor, it made them for the Debtor's benefit, albeit "indirectly," a condition the statute specifically covered.

Lastly, the transfers were made in respect of the Debtor's ownership of the stock Mayfield Rigging. What else could they have been for? No evidence suggests that the transfers were gifts to Mr. Reuss or his corporations or to the Debtor or loans to any of them. Mayfield Rigging had no legal obligation to pay its parent's legal bills. There is no evidence that it derived any benefit from paying them. Mr. Reuss identified no legitimate business purpose justifying the transfers. Mayfield Rigging made the transfers because the Debtor owned its stock and the common management directed it to pay Mr. Reuss' statements. It made the transfers "in respect of . . . its shares."

In the context of closely held corporations, there need not be a formal declaration of a dividend to reach the conclusion that a distribution by a subsidiary for the benefit of the parent is a dividend. *See Central of Ga. Ry. Co. v. Central Trust Co. of N.Y.*, 135 Ga. 472, 69 S.E. 708 (1910) ("[T]here may be

a division of profits among stockholders without the formality of declaring a dividend. Such division of profits is the equivalent of a dividend."); cf. *Bell Bakeries, Inc. v. Jefferson Standard Life Ins. Co.*, 245 N.C. 408, 96 S.E.2d 408 (1957).

A different way of examining the situation is to imagine the obvious alternative available to the Debtor. Rather than have the subsidiary pay Reuss directly, it might have "upstreamed" the funds to itself as formally declared dividends. It could then have paid Reuss directly for the value of the services he performed, subject to court approval of course. The transactions can thus be collapsed to reveal their true nature: the distribution of funds in which the Debtor and its estate held a property interest (the funds themselves and the right to receive them directly) at the moment of each transfer.

Courts frequently use the technique of "collapsing a transaction" (or substance-versus-form analysis) to describe the essence of a particular transaction or agreement. *See, e.g., HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir.1995) (consideration given to 'collapsing the transaction' in an alleged fraudulent conveyance action); *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3rd Cir.1986) (collapsing two separate loans into a single transaction); *Portland Mfg. Co. v. Comm'r*, 1975 WL 3580 (9th Cir.1975) (recognizing that the I.R.S. will collapse a transaction where it is found to be a sham). Here, the transactions, collapsed, reveal unauthorized transfers of valuable property rights of the Debtor's estate. The scheme was a sham designed to circumvent the very important functions of full disclosure and court approval of employment and compensation of professionals representing a Chapter 11 debtor. Where a wholly owned and solvent subsidiary of a Chapter 11 debtor secretly pays a professional employed by the debtor for services rendered to the debtor in its capacity as debtor in possession, the property transferred is, for purposes of § 541(a), property of the estate at the moment of the transfer.

■ This ruling is not to say that the property of a wholly owned, nondebtor subsidiary ordinarily constitutes assets of its parent's bankruptcy estate. "[A]bsent unusual circumstances, the property of a debtor's subsidiary is not considered property of the debtor by virtue of the debtor's sole ownership of the subsidiary." *Gould v. Smith (In re Holywell Corp.)*, 118 B.R. 876, 879 (S.D.Fla.1990) (citing *Feldman v. Trustees of Beck Indus., Inc. (In re Beck Indus., Inc.)*, 479 F.2d 410, 415 (2d Cir.1973), cert. denied, 414 U.S. 858, 94 S.Ct. 163, 38 L.Ed.2d 108 (1973)). *See also Regency Holdings (Cayman), Inc. v. Microcap Fund, Inc. (In re Regency Holdings (Cayman), Inc.)*, 216 B.R. 371, 375 (Bankr.S.D.N.Y.1998); cf. *Hibernia Nat'l Bank v. Perez*, 124 B.R. 704, 711 (E.D.La.1991), aff'd, 954 F.2d 1026 (5th Cir.1992). Nor should this court's holding be interpreted to mean that transactions by a nondebtor subsidiary outside the ordinary course of its business necessarily require bankruptcy court approval.

Even if the funds used to pay the fees were not property of the estate, the court would still have the authority to review them under § 329(b), as Mr. Reuss concedes. Section 329(a) section provides:

If such compensation [paid to an attorney representing a debtor] exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate, if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

(2) the entity that made such payment.

To the Debtor and the estate, the services rendered by Mr. Reuss had little value. The Chapter 11 case was unsuccessful, and the Debtor's business and assets were sold. Mr. Reuss claims to have spent more than 500 hours in this case, an astounding amount of time considering the lack of results. The billing statements are virtually indecipherable and do not prove that whatever work Reuss performed was necessary in order for the Debtor to carry out its duties. Entry

after entry in the billing statements describes telephone conversations, conferences, drafting of pleadings, and preparation of correspondence, with rarely a word about the substance of what he in fact did.

■■■ Even if Reuss' services had some value, the estate had no obligation to pay for them in the absence of court approval of his employment. So the charges for services were unreasonable and therefore excessive because Mr. Reuss failed to prove the value, if any, of his work and the Debtor had no obligation to pay even if the work had been exemplary.

What about Mayfield Rigging? It is conceivable that services to a debtor might have value to a third party, independent of any value to the estate. But Mr. Reuss also failed to show that his services had any value to Mayfield Rigging.

For these reasons the court holds that the fees charged by Reuss' corporations were in all respects unreasonable and excessive. Consequently, even if the transfers did not constitute property of the estate, the agreement would be subject to cancellation and total disgorgement. *See Arens v. Boughton (In re Prudhomme)*, 43 F.3d 1000, 1003 (5th Cir.1995) ("[T]he remedy for excessiveness is return of any payment to the extent it exceeds the reasonable value of services").

■■■ Mr. Reuss is personally liable to reimburse the Debtor's estate, notwithstanding the fact that his professional corporations were the initial recipients of the transfers from Mayfield Rigging. The enactment of the chapter of the Georgia Corporation Code permitting professionals to incorporate did not "change the law or existing standards applicable to the relationship between the person furnishing a professional service and the person receiving such service, including, but not by way of limitation, the rules of privileged communication and the contract, tort, and other legal liabilities and professional relationships between such persons." O.C.G.A. § 14-7-7. In *Henderson v. HSI Financial Services, Inc.*, 266 Ga. 844, 471 S.E.2d 885 (1996), the Georgia Supreme Court held that attorneys who were shareholders in a professional corporation

were not liable merely because they were shareholders for the misconduct of a fellow shareholder. "[L]awyers may practice their profession as shareholders in a professional corporation with the same rights and responsibilities as shareholders in other professional corporations." *Id.* at 845, 471 S.E.2d 885. The Court recognized, however, that an attorney who is negligent or who engages in misconduct cannot hide behind the corporate veil. O.C.G.A. § 14-2-622 provides that "a shareholder of a corporation is not personally liable for the acts or debt of the corporation *except that he may become personally liable by reason of his own acts or conduct."* (Emphasis added.)

■■■ Here, Mr. Reuss engaged in misconduct by filing false disclosure statements. He consciously failed to seek approval of his employment. He was at the very least negligent in advising the Debtor that it could legally cause its subsidiary to pay the Debtor's legal bills without disclosure to or approval by the court. Even if the transfers were not property of the estate, he engaged in misconduct by advising the Debtor to cause its subsidiary to pay him fees that were unreasonable and excessive. A lawyer who personally commits negligent or fraudulent acts or otherwise engages in misconduct in receiving fees from a client or third party cannot escape personal responsibility merely because the transfers were made in the first instance to that attorney's professional corporation. *Cf. In re G.I.C. Gov't Sec., Inc.*, 104 B.R. 475 (Bankr.M.D.Fla.1989).

■■■ Finally, the record contains ample evidence that Mr. Reuss consciously attempted to evade judicial review of his fee arrangement. He filed false Rule 2016(b) disclosure statements and permitted the Debtor to respond falsely on its Statement of Financial Affairs. The initial disclosure statement falsely stated that his fee arrangement was "to be determined." Reuss now admits that he had negotiated the fee arrangement involving Mayfield Rigging before filing the petition. The Statement of Financial Affairs falsely stated that no fees had been paid on behalf of the Debtor, when Mayfield Rigging had paid Reuss $2,500 on the petition date. The amendment to the Statement of Finan-

cial Affairs and to the disclosure statement falsely stated that officers of the Debtor had paid Reuss $60,000 before filing the petition to represent the officers and the Debtor with respect to their liabilities to the I.R.S. Reuss now admits that he received no cash from the Mayfields, that prior to the filing the petition, he abandoned or destroyed notes he received from the Mayfields and that the fee arrangement related to the bankruptcy representation of Mayfield Trucking. In adding that he had agreed not to submit a fee application, Reuss falsely implied that his fee arrangement had no effect on the estate. He knew, however, that the payments already made by Mayfield Rigging reduced the value of its stock by an amount equal to those payments. In the amendment he still did not follow the command of § 329(a) to disclose the source and amount of compensation he had already been paid.

It is well-settled that the court may deny compensation or order disgorgement of attorney's fees already paid as a sanction for failing to make full and candid financial disclosure. *See, e.g., Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis)*, 113 F.3d 1040 (9th Cir.1997); *Turner v. Davis, Gillenwater & Lynch (In re Inv. Bankers, Inc.)*, 4 F.3d 1556, 1565 (10th Cir.1993) ("[A]n attorney who fails to comply with the requirements of 329 forfeits any right to receive compensation for services rendered on behalf of the debtor … and a court may order an attorney sua sponte to disgorge funds already paid to the attorney.") (citations omitted.) Therefore, Mr. Reuss must pay to the Chapter 7 trustee an amount equal to the aggregate transfers he and his professional corporations received from Mayfield Rigging in connection with the Debtor's bankruptcy. This determination in no way precludes the possibility of additional sanctions under Fed. R.Bankr.P. 9011 after notice to Mr. Reuss and a hearing, sanctions that the U.S. Trustee did not request. Obviously, Mr. Reuss's compliance or lack of compliance with this order bears on the amount of any additional sanction to which he could be subject.

For these reasons, it is

ORDERED that Eric P. Reuss, Eric P. Reuss, P.C. and Reuss Legal Services, P.C. immediately pay to the Chapter 7 trustee the sum of $93,177.69.